IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SYSTEM FUELS, INC. on its own behalf and, as agent for ENTERGY LOUISIANA, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2621C (Judge Williams) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY, MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT, AND MOTION TO DISMISS COUNT III OF PLAINTIFF'S COMPLAINT

Pursuant to Rule 56 of the Rules of this Court ("RCFC"), defendant, the United States, respectfully files this response to the motion for summary judgment on liability that plaintiff, System Fuels, Inc. ("SFI"), filed in this case and further requests that Court grant summary judgment in defendant's favor upon Counts I and II of the plaintiff's complaint. Defendant further respectfully requests that the Court dismiss Count III of SFI's complaint for failure to state a claim upon which relief can be granted. There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor. In support of our motion, we rely upon the following brief and appendix, the accompanying proposed findings of uncontroverted fact, and the pleadings filed by the parties in this case.

STATEMENT OF THE ISSUES

1. Whether SFI has any basis upon which to seek breach of contract damages that pre-date the Government's actual partial breach of any obligations running directly to SFI.

2. Whether SFI's claim asserting breach of the duty of good faith and fair dealing fails because SFI cannot present "well-nigh irrefragable proof" to overcome the presumption that the Government acted in good faith.

3. Whether SFI's takings claim, which arises from an alleged breach of contract, fails to state a claim upon which relief can be granted.

## STATEMENT OF FACTS

For our statement of facts, we respectfully refer the Court to our proposed findings of uncontroverted fact, which accompany this motion.

## SUMMARY OF ARGUMENT

SFI alleges in its complaint and its motion for summary judgment that the Department of Energy ("DOE") partially breached its Standard Contract on January 31, 1998, when it failed to begin acceptance of spent nuclear fuel ("SNF") on that date. However, under the terms of the Standard Contract, and contrary to the implications of SFI's briefing, DOE was not obligated to accept SNF from every Standard Contract holder on that date. Instead, the Standard Contract establishes a mechanism by which specific acceptance obligations from individual Standard Contract holders, including the specific amounts of SNF that are to be accepted during specific periods of time and at specific locations under specific Standard Contracts, are created and defined. In accordance with the Standard Contract's contractual mechanism for creating these specific acceptance obligations, SFI would have submitted delivery commitment schedules ("DCSs") to DOE no later than 1992, if it had SNF to be accepted by DOE in January 1998. However, under the terms of the Standard Contract, DOE is obligated to accept SNF from the nuclear utility contract holders in the order in which it was generated, on an "oldest fuel first"

basis developed by comparing the age of SNF across the nuclear industry. Because SFI owns a relatively new nuclear reactor, it did not have any SNF allocations for acceptance of its SNF within at least the first ten years of the SNF acceptance program. Although SFI could have submitted DCSs to DOE seeking to obtain DOE's agreement to accept SFI's SNF outside of an "oldest fuel first" acceptance queue, SFI made no effort to do so.

Because SFI has no basis upon which to argue that DOE was obligated to have begun acceptance of its SNF prior to the date upon which it filed its complaint, SFI's breach of contract claim fails as a matter of law. DOE has not breached its obligations under the Standard Contract to accept SFI's SNF, and, thus, SFI's right to sue for breach of contract has not yet accrued. Because there is no legal doctrine that would permit a party to recover damages for a partial breach of contract before the partial breach occurs, SFI has no right to recover any damages at this time. Further, under straightforward contract law, SFI has not suffered any cognizable injury because DOE has failed to begin SNF accept from other utility contract holders that have earlier allocation rights. SFI can only assert a breach of contract claim for a breach of its own contract with DOE. Because SFI had no allocation rights for SNF acceptance before the date on which it filed its complaint and, in fact, would not have been in line for SNF acceptance for many years to come, there can be no breach of contract here that runs to SFI's acceptance rights. To the contrary, SFI's claim here is for a liability ruling based upon DOE's failure to accept other contract holders' SNF. SFI has no basis for seeking damages based upon DOE's failure to accept other entities' waste. Instead, to establish its own entitlement to damages, it must identify the rights and obligations that DOE had to accept SFI's SNF and that DOE's failure to act in accordance with those obligations constituted a breach of SFI's contract. Because SFI does not

have any basis for asserting that DOE was obligated to accept any of its SNF under the Standard Contract by January 31, 1998, or even by the date upon which it filed its complaint, it has no basis for seeking damages from this Court at this time.[1]

## ARGUMENT

### I. THE GOVERNMENT IS ENTITLED TO SUMMARY JUDGMENT UPON SFI'S BREACH OF CONTRACT CLAIM BECAUSE SFI HAS SOUGHT DAMAGES BEFORE ANY RIGHT TO ACCEPTANCE OF ITS SNF BY DOE HAS ACCRUED

#### A. The Standard Of Review For Summary Judgment

Summary judgment is an acceptable and favored procedural means for disposition of claims or issues as to which there are no genuine issues of material fact in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). "[T]here is no genuine issue of material fact for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) (quoting Anderson, 477 U.S. at 249-50). When the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. RCFC 56(c).

---

[1] Further, SFI's claim for breach of implied covenant of good faith and fair dealing fails as a matter of law because its claim is based on a contract delay and there is no clear and convincing evidence that DOE did not act in good faith. Finally, SFI's claim for an uncompensated taking also fails as a matter of law because it arises from an alleged breach of contract.

B. SFI Cannot Seek A Liability Ruling When DOE Has Not Breached Any Contract Obligation To Accept SFI's Spent Nuclear Fuel And When SFI Cannot Establish Any Damage

SFI cannot legitimately dispute that the Standard Contract did not require DOE to begin accepting SNF from each and every Standard Contract holder by January 31, 1998. Instead, the Standard Contract only required DOE to begin its program of accepting SNF from the contract holders as a whole by that date. Yet, SFI's complaint is premised upon the assumption that DOE's partial breach of the Standard Contract resulting from DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998, automatically created an injury-in-fact to each and every member of the commercial nuclear utility industry. See Compl. ¶ 5.[2] Although SFI asserts that it is clear that the Government's delay in beginning SNF and/or HLW acceptance by January 31, 1998, constitutes a partial breach of the Standard Contract, that delay, in and of itself, does not create liability to any particular contract holder or establish that any particular contract holder has incurred any damages as a result of the Government's breach of contract. Instead, under the terms of the Standard Contract, as will be explained below, DOE's inability to accept SNF identified in approved delivery commitment schedules that creates and defines DOE's liability.

The existence of a breach of contract is but one component of the issue of liability. See The Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F. Supp. 1164, 1166 (S.D. Ind. 1992) (plaintiff "requested a judgment finding in Plaintiff's favor on the *issue* of liability and not merely a component *element* of that issue (whether there was a breach)" (italics in original)); see also

[2] "Compl. ¶ ___" refers to the complaint that the plaintiff filed in this case. "A. ___" refers to the appendix to this brief.

Winstar Corp. v. United States, 21 Cl. Ct. 112, 117 (1990) ("court requires further briefing on several elements of plaintiffs' contract claim which are necessary to determine liability," including "whether a breach occurred" and, "if so, whether it resulted in injury"), aff'd, 64 F.3d 1531 (Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996). Further, the Court of Claims has recognized that, before a contractor is entitled to judgment as to entitlement, it must establish as part of its proof that it suffered some damage, beyond mere speculation, because of the Government's actions:

> Even if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions, and it has failed to do so . . .

Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977). "A wrong done, but from which no loss or damage results, . . . will not sustain an action." Cosmo Constr. Co. v. United States, 196 Ct. Cl. 463, 469 n.3, 451 F.2d 602, 605 n.3 (1971) (quoting Black's Law Dictionary (4th ed.)). In an action bifurcated as to entitlement and quantum issues, "evidence on damages or quantum is not totally excluded [from consideration of the entitlement phase of the case], because there must be some evidence of damage to support a finding on liability" that is "sufficient to demonstrate that the issue of liability is not purely academic." Id. at 469-70, 451 F.2d at 605-06 (emphasis in original).

Here, as will be discussed below, SFI could not have suffered any injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility contract holders by January 31, 1998, under the Nuclear Waste Policy Act program. Instead, any injury that SFI incurred would result from DOE's failure to accept SFI's SNF as identified in SFI's approved DCSs. However, as discussed below, because SFI has never submitted a DCS to DOE for

approval, it has no basis for asserting that DOE failed to act in accordance with the terms of the Standard Contract with regard to its DCS submissions or acceptance of its SNF. Because the January 31, 1998, deadline for beginning SNF acceptance is not a deadline that required DOE to begin accepting SNF from each and every contract holder by January 31, 1998, but, instead, is a statutory deadline by which DOE was required to begin its program of accepting SNF from the contract holders as a collective whole, SFI must establish, before it can seek a liability ruling, that DOE had a specific obligation to accept particular SNF from SFI by the date that it filed its complaint and that DOE breached that specific obligation to SFI. Absent such a showing, SFI has not identified any injury-in-fact that could provide this Court with a basis to consider a liability ruling or any cause of any damage to SFI.

As explained below, the Standard Contract created a mechanism by which contract holders would obtain commitments from DOE that would define the specific 12-month periods – beginning January 31, 1998 – within which DOE would accept specific amounts of SNF from specific contract holders. That contractual mechanism required all contract holders, when they wanted DOE to accept their SNF, to timely submit a DCS to DOE at least 63 months prior to the desired SNF acceptance date, followed by submission of a final delivery schedule. See 10 C.F.R. § 961.11, Art. V.B. Submission of a DCS, followed by actions necessary to obtain DOE's approval of that DCS, constituted a condition precedent to DOE's obligation to accept any SNF from any particular contract holder.

C. A Primary Requirement Of The Standard Contract Is That Oldest Fuel Generated In The Industry Receives Priority For Acceptance And That Acceptance Rights Be Defined In Delivery Commitment Schedules

The Standard Contract identifies a general framework for determining the order, or priority, of SNF acceptance from the various contract holders. It provides that "acceptance priority [for contract holder SNF and HLW] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." 10 C.F.R. § 961.11, Art. VI.B.1. It further provides that "DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V" and in paragraph B.1.b of Article VI. Id. Therefore, the Standard Contract generally requires that the "order" of DOE's acceptance of contract holders' SNF be based upon an "oldest fuel first" scenario, subject, among other things, to definitization of an allocation commitment to accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

Pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5.b. The Standard Contract provided DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance that it anticipated, at any given time, might be utilized by DOE once SNF acceptance began. See id. Further, beginning on April 1, 1991, DOE was to "issue an annual acceptance priority

ranking for receipt of SNF and/or HLW at the DOE repository," based upon "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a.

Further, beginning January 1, 1992, following DOE's issuance of the 1991 Annual Capacity Report and Acceptance Priority Ranking, the contract holders were required to submit delivery commitment schedules to DOE, "in the form set forth in Appendix C" to the Standard Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; A. 145-52 ("Instructions For Completing The Appendix C Delivery Commitment Schedule").

DOE was to "approve or disapprove such schedules within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2. "In the event of disapproval [of the revised DCS submission], DOE [was to] advise the Purchaser in writing of the reasons for such disapproval and [to] submit [DOE's] proposed schedule." Id. If

the contract holder disagreed with DOE's proposed schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

Upon approval by DOE, the delivery commitment schedule defined, among other things, the first year in which DOE was obligated to begin acceptance of a contract holder's SNF, and the amount of SNF that DOE was to take from a particular contract holder in a given year. 10 C.F.R. § 961.11, Appendix C. As the Standard Contract expressly provided, the SNF that DOE was to accept for any particular year "shall be specified in a delivery commitment schedule as provided in Article V below." Id., Art. II. Absent a delivery commitment schedule, DOE had no basis for identifying any SNF that a contract holder intended to deliver to DOE within a given year. Further, the "oldest fuel first" acceptance priority ranking in Article VI.B.1 of the Standard Contract was made expressly contingent upon the DCS provisions in Article V.B, indicating that, absent a submitted and approved DCS for a given year, a contract holder would lose its priority, or right to SNF acceptance, for that year. Thus, a contract holders' submission of a DCS, and DOE's approval thereof, determined the first year in which DOE was obligated to begin acceptance of the contract holder's SNF and HLW.

Indeed, a contract holder's failure to submit a delivery commitment schedule at least 63 months before its acceptance allocation waives its position in the acceptance queue for that particular allocation period. Absent an approved DCS through which a contract holder commits to delivering a specific amount of SNF to DOE in a given year, there is no basis in the Standard Contract upon which DOE could, or would, be able to accept any SNF from a contract holder in that year. If a contract holder elects not to submit a DCS for a particular year in which DOE had

provided it an allocation, the contract holder has waived its rights to acceptance for that allocation period.

The delivery commitment schedule thus defined the amount of SNF and/or HLW that DOE would accept from a contract holder in a given year, and established the first year in which DOE was obligated to begin that acceptance. Further definitization of the timing for SNF and/or HLW acceptance came through the submission, review, and approval of final delivery schedules. Specifically, not less than 12 months before the delivery date "for delivery of SNF and/or HLW covered by an approved [DCS], the contract holder holding that DCS was required to "submit to DOE final delivery schedules . . . ," which DOE would review and either approve or disapprove. 10 C.F.R. § 961.11, Art. V.C. The final delivery schedule required identification of the proposed "delivery first estimate" to further define the specific dates for SNF and HLW acceptance during the assigned year. As with the DCS submittal and approval process, if the parties could not agree upon the final delivery schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)."[3] Id.

---

[3] If the parties could not agree upon a disapproved delivery commitment schedule or a final delivery schedule after negotiation, the Standard Contract's "Disputes" clause would apply. 10 C.F.R. § 961.11, Art. XVI.A. Pursuant to that clause, "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy to the Purchaser." Id. The contracting officer's decision is final and conclusive unless, within 90 days from the purchaser's date of receipt of the decision, the purchaser appeals in writing to the Department of Energy Board of Contract Appeals. Id.

D. Under The "Oldest Fuel First" Allocation System, And Based Upon SFI's Failure To Submit Any DCSs, DOE Has Not Yet Breached Any Obligation To Accept SNF From SFI

One of the stated objectives of the Standard Contract was to dispose of SNF in the order that it is discharged from reactors. To achieve that goal, the Standard Contract specifically provided for SNF acceptance priority among contract holders upon an "oldest fuel first" basis. 10 C.F.R. § 961.11, Art. VI.B.1. The Standard Contract provided for the issuance of an acceptance priority ranking, based on the oldest fuel first principle, beginning in April 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

In compliance with the NWPA and the language of the Standard Contract, DOE issued the 1991 Acceptance Priority Ranking in December 1991. That APR stated:

> The 1991 APR will be the basis for the annual allocation of waste acceptance capacity to the Purchasers in the 1991 Annual Capacity Report (ACR), to be issued later this year. Purchasers with allocation in the first 10 years following the projected commencement of the Federal waste management facility operations may submit Delivery commitment Schedules (DCS) beginning January 1, 1992. The allocations in the 1991 ACR will be the basis for the DCS submittals.

According to that APR, the first SNF discharge dates recorded were in November 1967. The first SNF discharge recorded for SFI's facility at Waterford 3 was in November 1986. Given Waterford's recent vintage, it did not have fuel old enough to be placed into the allocation ranking for acceptance by DOE within the first ten years. In fact, the 1995 Acceptance Priority Ranking ("APR") and Annual Capacity Report ("ACR") shows that, had DOE begun SNF acceptance from the contract holders in 1998, SFI would not have had any allocation in at least the first ten years of DOE's acceptance of SNF. A. 296 (1995 APR/ACR, Table 2, p. 6). Further,

SFI never submitted any DCSs to DOE to indicate that it had any expectation that DOE was obligated to accept its fuel in January 1998 or at any other time to the present date.

E. SFI's Assertion That DOE Was Obligated To Begin SNF Acceptance From SFI Itself On January 31, 1998, Conflicts With SFI's Past Conduct And The Language Of The Standard Contract

In its motion for summary judgment, SFI suggests that it was entitled to have DOE begin accepting its SNF by January 31, 1998. As previously explained, any such requirement would completely conflict with the "oldest fuel first" acceptance requirement in the Standard Contract. In Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), this Court recognized the nature of the Standard Contract and the fact that the January 31, 1998 date identified in the Standard Contract did not mean that every Standard Contract holder would have its SNF accepted by that date:

> It bears noting, however, that TVA was not entitled to have its SNF removed beginning in January 1998. Rather, the earliest that any of TVA's SNF would have been collected by DOE was sixty-three months after TVA's submission of its first proposed DCS. See Standard Contract Art. V.B.1. TVA submitted its first proposed DCS, for the collection of 58.7 MTU from the Sequoyah plant, in April of 1997. Consequently, the earliest scheduled pickup of TVA's SNF would have occurred in July 2002, putting aside the possibility of adjusting a final schedule by two months under Article B.2.

Id. at 674.

Further, SFI never took any action during the course of contract performance that would have allowed DOE to take any of its SNF by January 31, 1998. Had it wanted DOE to begin acceptance of its SNF by that date, it would have had to have submitted a DCS identifying the SNF that it wanted taken and the time period within which it wanted that SNF taken. Yet, it has never submitted a DCS to DOE. Apparently, SFI now believes that DOE was simply supposed

to appear at its site on January 31, 1998, and "begin" to take some undefined amount of its SNF. Yet, outside the DCS procedures identified in the Standard Contract, there is no other mechanism through which the parties notify each other of the dates upon which DOE will accept specific amounts of SNF from a particular contract holder.

The costs that DOE incurs to prepare to accept SNF from a particular site, including travel and transport, are extensive, and it also takes time for the nuclear utility to prepare to deliver the SNF to DOE. SFI's suggestion that no mechanism exists in the Standard Contract for ensuring that, if DOE travels to a site, the contract holder will actually have SNF to deliver to DOE is extraordinary. Given that SFI has never satisfied the only procedure contained in the Standard Contract for obtaining an acceptance and delivery obligation in 1998, SFI's assertion that DOE breached its contract by not accepting its SNF in 1998 is ludicrous. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "One may not ignore the interpretation and performance of a contract, whether termed 'mistake' or not, before a dispute arises." Alvin Ltd. v. United States Postal Serv., 816 F.2d 1562, 1566 (Fed. Cir. 1987). "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983).

SFI implies that the Government's position that plaintiff is not entitled to damages directly stemming from the January 31, 1998 acceptance date are barred by the United States Court of Appeals for the Federal Circuit's decision in Maine Yankee Atomic Power Co. v. United

States, 225 F.3d 1336 (Fed. Cir. 2000). SFI is incorrect. At the time that the Government filed its interlocutory appeal in Maine Yankee in July 1999, all three of the plaintiffs-appellees in that appeal had previously submitted and obtained approval of DCSs that required DOE to begin acceptance of specific amounts of their SNF either by January 31, 1998, or January 31, 1999. Accordingly, because the date for DOE to begin acceptance of these plaintiffs-appellees' SNF had already passed, DOE had already committed its partial breach, and no reason existed to note the contractual mechanisms for establishing the specific SNF delivery and acceptance commitments. As a result, unlike this case, the Government did not raise in the Maine Yankee appeal the point concerning the DCS process or the lack of specific commitments absent approved DCSs under the Standard Contract's schedule terms.

Because the Government did not, and did not need to, raise the issue presented here in the Maine Yankee appeal, the Maine Yankee decision does not constitute stare decisis regarding whether DOE partially breached the Standard Contract with regard to the plaintiff in this case. "Stare decisis applies only to legal issues that were actually decided in a prior action" and not to issues that "were not litigated or resolved" in a prior action. Beacon Oil Co. v. O'Leary, 71 F.3d 391, 395 (Fed. Cir. 1995). Because the issues regarding plaintiff's need to submit DCSs and the role of DCSs in the contractual scheme of defining acceptance commitments was not evaluated or decided in Maine Yankee, that decision does not constitute stare decisis regarding that issue and does not, in any event, establish that DOE breached every single Standard Contract on January 31, 1998, in a manner that creates liability to each contract holder.[4]

---

[4] Further, to the extent that SFI were to attempt to argue, which it has not, that the Government is somehow barred by collateral estoppel from attempting to raise the DCS issue here in arguing against plaintiff's standing to maintain its claims, the argument would fail. As

F. Because DOE Is Not Obligated To Accept SFI's SNF During the First Ten Years Of SNF Acceptance Under The Standard Contract, SFI Cannot Identify Any Breach That Runs Directly To SFI

Pursuant to the 1995 APR/ACR, DOE's obligation to accept SFI's SNF will not arise until some date after January 2008. Accordingly, SFI has not yet accrued any right to have DOE accept its SNF under the Standard Contract. Although SFI could have submitted a DCS to DOE as early as 1992, seeking to have DOE agree to accept its SNF outside of the "oldest fuel first" allocation queue,[5] SFI never made any such effort. Accordingly, SFI could not have suffered any injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998. Any injury that SFI incurred would result from DOE's failure to accept SFI's SNF as identified in SFI's approved DCSs. However, as explained above, SFI did not submit any DCSs that required DOE to begin SNF acceptance of SFI's SNF. Consequently, SFI has no basis for arguing that DOE's failure to accept SNF on January 31, 1998, caused it to incur damages. Instead, it appears that the first "breach" that might have caused an injury to SFI

---

previously explained, because of the factual circumstances surrounding the three plaintiffs-appellees in the Maine Yankee appeal and that DOE had made (and breached) commitments to accept SNF from all of those plaintiffs-appellees prior to the appeals at issue, it was unnecessary to raise the DCS issue in that appeal. Accordingly, collateral estoppel would not somehow apply the pronouncements in the Maine Yankee decision to this case because "determination of the issue in the prior litigation was [not] a critical and necessary part of the judgment in that action." Bayer AG. v. Biovail Corp., 279 F.3d 1340, 1345 (Fed. Cir. 2002).

[5] We are not suggesting that SFI's effort would have been successful. For DOE to have agreed to have accepted SFI's SNF outside of the "oldest fuel first" allocation system required by the Standard Contract, SFI would have had to have identified a reason under the "Priority for Shutdown Reactors" or the "Emergency Deliveries" provisions of the Standard Contract for DOE to accept SFI's SNF earlier than it would under an "oldest fuel first" allocation. 10 C.F.R. § 961.11, Art. VI.B.1.b & VI.B.1.d. We are aware of no basis upon which SFI could have made such a request. In any event, SFI never submitted such a request to DOE, leaving SFI to the allocations that it would receive under the "oldest fuel first" allocation system. Those allocations would have been at some point after January 2008.

would not have occurred until sometime after January 2008, when SFI's SNF would have been given some allocation rights based upon the age of its SNF.

G. Because Damages For A Partial Breach Of Contract Are Measured From The Date Of The Partial Breach, SFI Has No Basis At This Time For Seeking Damages Or A Liability Ruling

Generally, "breach of contract damages are measured from the date of the breach." Lucente v. International Bus. Machines Corp., 310 F.3d 243, 262 (2d Cir. 2002) (applying New York law) (emphasis added); see Reynolds v. United States, 141 Ct. Cl. 211, 220, 158 F. Supp. 719, 725 (1958) ("[t]he time when performance should have taken place is the time as of which damages are measured"). Yet, SFI is claiming that its damages preceded DOE's obligation to begin acceptance of SFI's SNF. To the extent that SFI is asserting that its contract breach damages actually preceded DOE's breach of its obligation to begin accepting SFI's SNF, SFI's assertion would conflict with the type of breach upon which it is maintaining an action in this case.

Here, SFI is not seeking damages for a total breach of contract, but instead is asserting only a partial breach.[6] In awarding damages for breach of contract, a fact-finder therefore has to

[6] If SFI were to assert a claim based upon a total breach of contract, that would conflict with the complaint that it filed. When a total breach of contract occurs, the contract is deemed to be at an end, and, although the non-breaching party may recover damages for the total breach from the breaching party, neither party has any further obligations to continue performance under the totally breached contract. See Cities Service Helix, Inc. v. United States, 211 Ct. Cl. 222, 234, 543 F.2d 1306, 1313 (1976); Hanson Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 100 (2002). Had it pursued and prevailed upon such a theory, the Department of Energy would have had no further obligation to perform the Standard Contract or to accept the SNF generated under SFI's Standard Contract, although DOE would potentially have been liable to SFI in damages for its total breach. Only under a partial breach of contract theory may SFI recover some damages for DOE's alleged breach of contract and, at the same time, insist on continuing contract performance obligations. See Lovink, 878 F.2d at 587.

"differentiate between a total or material breach on the one hand and a partial breach on the other, and to measure damages, if any, according to the nature of the breach." Lovink v. Guilford Mills, Inc., 878 F.2d 584, 587 (2d Cir. 1989). To recover damages preceding the actual performance date in a contract, the non-breaching party must establish that the other party anticipatorily repudiated the contract prior to the scheduled contract performance date. Yet, "a breach by repudiation alone can only give rise to a claim for total breach . . .," Restatement (Second) of Contracts § 253 cmt. b (emphasis added), and "an anticipatory breach cannot be predicated on a partial breach of the contract . . . ." City of Fairfax, Va. v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1331 (4th Cir. 1978) (emphasis added), cert. denied, 440 U.S. 914 (1979); see Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 648 (2004) (in spent nuclear fuel case, "[a]nticipatory repudiation does not apply in a partial breach situation"); 4 A. Corbin, Corbin on Contracts § 972, at 901 (1951) ("there seems to be no authority for saying that, for such a partial anticipatory repudiation, an action for damages can be at once maintained"). Accordingly, because SFI cannot claim the existence of an anticipatory repudiation of the Standard Contract, it cannot recover damages that precede the actual partial breach of contract. Because DOE's obligations to begin accepting SFI's SNF will not arise until sometime on or after January 2008, SFI has no basis upon which to recover partial breach damages here. Further, as previously discussed, in an action bifurcated as to entitlement and quantum issues, "evidence on damages or quantum is not totally excluded [from consideration of the entitlement phase of the case], because there must be some evidence of damage to support a finding on liability" that is "sufficient to demonstrate that the issue of liability is not purely academic." Cosmo Constr., 196 Ct. Cl. at 469-70, 451 F.2d at 605-06; see Puritan Assocs., 215

Ct. Cl. at 978. Because no partial breach of DOE's obligation to accept SNF from SFI itself has occurred, SFI has no basis upon which to obtain a liability ruling.

## II. SFI'S GOOD FAITH AND FAIR DEALING CLAIM FAILS AS A MATTER OF LAW BECAUSE IT IS BASED UPON A DELAY IN CONTRACTUAL PERFORMANCE AND SFI CANNOT PRESENT "WELL-NIGH IRREFRAGABLE PROOF" TO OVERCOME THE PRESUMPTION THAT THE GOVERNMENT ACTED IN GOOD FAITH

In its complaint, SFI asserts that the "Standard Contract between SFI and DOE contains an implied covenant of good faith and fair dealing pursuant to which DOE has a duty to perform its obligations under the contract in good faith and not to take actions detrimental to SFI's contractual rights." Compl. ¶27. SFI claims that "DOE has breached the covenant of good faith and fair dealing by failing and refusing to make any effort to meet the contractual deadline for beginning to dispose of SNF." Id.

SFI's contention that the Government breached the covenant of good faith and fair dealing by failing to take appropriate action to meet its contractual commitment to begin accepting SFI's SNF by January 31, 1998, is nothing more than an allegation that the Government breached the Standard Contract. Nevertheless, even if this claim could survive independently from its breach of contract claim,[7] this allegation, without more, cannot form the basis for a claim for breach of

---

[7] Although "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," Restatement (Second) of Contracts § 205, "[t]he obligation of good faith . . . is not an 'independent source of duties for parties to a contract.'" Allstate Fin. Corp. v. Utility Trailer of Ill., Inc., 936 F. Supp. 525, 529 (N.D. Ill. 1996) (quoting Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir. 1992)). "Rather, it guides the construction of explicit terms of an agreement." Allstate, 936 F. Supp. at 529 (emphasis added). "The implied covenant is limited to assuring compliance with the express covenants or promises of the contract, and cannot be extended to create obligations not contemplated in the contract." Kucharczyk v. Regents of Univ. of Calif., 946 F. Supp. 1419, 1432 (N.D. Cal. 1996); see State of Alaska v. United States, 35 Fed. Cl. 685, 704 (1996) ("implied obligation of good faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the parties"),

the covenant of good faith and fair dealing. As the Court held in Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234 (Fed. Cir. 2002), the presumption that the Government acted in good faith can only be overcome by "clear and convincing evidence" of bad faith, which "has been equated with evidence of some specific intent to injure the plaintiff." Indeed, allegations of bad faith have generally arisen in instances involving "fraud" or "quasi-criminal wrong-doing" by Government officials. Id. at 1240.

To establish that the Government's delay in performance was in bad faith, SFI must present "clear and convincing evidence" equivalent to what is necessary to establish that DOE's conduct was "motivated alone by malice," Gadsden v. United States, 78 F. Supp. 126, 128 (Ct. Cl. 1948), "designedly oppressive," Struck Construction Co. v. United States, 96 Ct. Cl. 186, 222 (Ct. Cl. 1942), or "actuated by animus toward the plaintiff," Librach v. United States, 147 Ct. Cl. 605, 612 (1959), cited in Kalvar Corp. v. United States, 543 F.2d 1298, 1302 (Ct. Cl. 1976), and Am-Pro Protective Agency, 281 F.3d at 1240. Here, SFI cannot present any evidence, let alone "clear and convincing evidence," to indicate that the Government's delay in accepting SFI's SNF

---

aff'd, 119 F.3d 16 (Fed. Cir. 1997), cert. denied, 1108 (1998). "[S]uch generalized obligations as not interfering with the other party's performance, or failure to act in good faith, must have a contract performance referent to have any relevance." C.B.C. Enterprises, Inc. v. United States, 24 Cl. Ct. 1, 5 (1991). There must be a "nexus alleged between the Government's allegedly tortious breach of these implicit conduct obligations and any express term of the contract." Id.; see Village on Canon v. Bankers Trust Co., 920 F. Supp. 520, 534 (S.D.N.Y. 1996) (duty of good faith "does not create any new contractual rights" other than those expressly stated in the contract itself, "nor does it provide an independent basis for recovery"); Asco-Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595, 598 (1994) ("defendant only had a duty to render a decision within a reasonable time if it had an explicit contractual obligation to take some action on the applications"); Heagy v. United States, 12 Cl. Ct. 694 (1987) (no breach of contract can exist unless it is based upon actual requirement contained in the contract), aff'd, 848 F.2d 1244 (Fed. Cir. 1988). To prevail upon its claim for a breach of the duty of good faith and fair dealing, the plaintiff must identify an express requirement within the contract that DOE breached.

was in bad faith. In fact, SFI's allegation amounts to nothing more than a claim for breach of contract as a result of delay in performance. However, when performance of the contract at issue is highly regulated, where the contract involves disposal of nuclear waste, and where performance was initially contemplated to require over 15 years of preparation and many more years to complete, the Government's delay in performance cannot be said to be in bad faith. To the extent that its partial breach contract claims otherwise survive this motion, its motion premised upon the duty of good faith and fair dealing should be dismissed. See Am-Pro Protective Agency, 281 F.3d at 1240 ("the requirement of 'well-nigh irrefragable' proof [] sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith"); Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("contractor can overcome [the presumption that the Government acts in good faith] only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it"); Sanders v. United States Postal Service, 801 F.2d 1328, 1331 (Fed. Cir. 1986) ("there is a strong presumption in the law that administrative actions are correct and taken in good faith"); Torncello v. United States, 681 F.2d 756, 770 (Ct. Cl. 1982) (Government "is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary").

## III. SFI'S CLAIM FOR AN UNCOMPENSATED TAKING FAILS AS A MATTER OF LAW BECAUSE IT ARISES FROM AN ALLEGED BREACH OF CONTRACT

### A. The Standard For Dismissal For Failure To State A Claim

In considering whether to dismiss a complaint for failure to state a claim upon which relief can be granted, this Court will grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

Conley v. Gibson, 355 U.S. 41, 45-46 (1957), quoted in B & F Trawlers, Inc. v. United States, 27 Fed. Cl. 299, 302 (1992). In making this decision, the Court will accept the factual allegations set forth in the complaint as true. E.g., Papasan v. Allain, 478 U.S. 265, 268 (1986); B & F Trawlers, 27 Fed. Cl. at 302. However, the Court should not place any weight upon any assertions in the complaint other than allegations of fact, since "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162 (1992) (quoting 2A J. Moore, Moore's Federal Practice, ¶ 12.07 [2.-5], at 12-84 to -85 (2d ed. 1995)).

B. The Nuclear Waste Policy Act Did Not Create Any Vested Property Rights For Nuclear Utilities, And A Utility's Right To Acceptance of Its SNF Was Based Upon Its Execution of The Standard Contract

In Count III of its complaint, SFI asserts a cause of action for an uncompensated taking, claiming that "[t]he Government's failure and refusal to comply with the requirements of the Standard Contract for acceptance and disposal of SFI's SNF constitutes a taking of SFI's vested real property rights." Compl. ¶33. SFI further states that "[t]he Government's conduct has deprived, and will continue to deprive, SFI of the full valuable economic use of that site, as well as the real property on which the SNF is stored and from which it cannot lawfully be removed." Id. SFI thus concludes that it "is entitled to just compensation for this taking of SFI's real property in an amount to be determined at trial." Id.

Although SFI attempts to ground its takings claim upon the Nuclear Waste Policy Act of 1982 ("NWPA"), codified at 42 U.S.C. §§ 10101-10270, the NWPA did not create any vested property rights for nuclear utilities. One of the purposes of the NWPA was "to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent

fuel." Id. § 10131(b)(2). In passing the NWPA, Congress included statutory findings that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of SNF, although Congress also found that the costs of the interim and permanent storage and disposal of SNF were the responsibility of those entities that created the SNF. 42 U.S.C. § 10131(a)(4)-(5).

Pursuant to section 302(a) of the NWPA, 42 U.S.C. § 10222(a), the Secretary of Energy was "authorized to enter into contracts with any person who generates or holds title to [SNF] of domestic origin for the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1). Further, the Secretary of Energy was barred from disposing of any SNF under the NWPA, "unless the generator or owner of such [SNF] has entered into a contract with the Secretary under this section by not later than . . . June 30, 1983; or . . . the date on which such generator or owner commences generation of, or takes title to, such [SNF]; whichever occurs later." 42 U.S.C. § 10222(b)(2) (emphasis added). As a result, DOE's obligation to dispose of a utility's SNF was conditioned upon the existence of a contract between the utility and DOE. DOE implemented the requirements of section 302(a) of the NWPA by promulgating the Standard Contract, 10 C.F.R. § 961.11 (1983). The Standard Contract required DOE to begin "[t]he services to be provided by DOE" under the Standard Contract "not later than January 31, 1998." 10 C.F.R. § 961.11, Art. II.

In 1984, SFI executed its Standard Contract with DOE. Compl. ¶ 9. Absent that Standard Contract, DOE would not have any obligation to accept any SNF generated at SFI's Waterford 3 nuclear reactor. Other than through the Standard Contract, the Department of Energy has no statutory, regulatory, or other legal obligation to accept or dispose of the SNF that

SFI generates through its production of nuclear power. To the contrary, without the Standard Contract, SFI is solely responsible for the storage and protection of the SNF that it generates.

C. To Establish A Viable Takings Claim, SFI Must Establish That It Is Not Merely Seeking A Contractual Remedy

"In analyzing a takings claim, a court must first determine what was taken." Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1995). As the Court of Claims has long recognized, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract." Sun Oil Co. v. United States, 572 F.2d 786, 818 (Ct. Cl. 1978). If "alleged damage is due to and measured in reference to plaintiffs' performance of a contract, and is exclusively money damages, plaintiffs' claim that the wrong originated in some statutory" or constitutional "violation does not strip the case of its contractual nature." A&S Council Oil Co. v. Lader, 56 F.3d 234, 241 (D.C. Cir. 1995). "In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Sun Oil, 572 F.2d at 818; see also J.J. Henry Co. v. United States, 411 F.2d 1246, 1249 (Ct. Cl. 1969); Transpace Carriers, Inc. v. United States, 27 Fed. Cl. 269, 274 (1992); Marathon Oil Co. v. United States, 16 Cl. Ct. 332, 338-39 (1989).[8]

That is, remedies for alleged infringement of any rights established contractually generally lie in contract, not the Fifth Amendment, as it is the terms of the contract that govern the parties' respective rights and obligations. Sun Oil, 572 F.2d at 818; see Larson v. Domestic &

[8] When the Government is acting in its contracting, or proprietary, capacity, rather than in its sovereign capacity, no "taking" under the Fifth Amendment can arise because the Government's dealings "are contractually oriented, not taking intended or motivated." Data Transformation Corp. v. United States, 13 Cl. Ct. 165, 177 (1987) (citing Radioptics, Inc. v. United States, 621 F.2d 1113, 1126-29 (Cl. Ct. 1980)).

Foreign Commerce Corp., 337 U.S. 682, 703 n.27 (1949) (if there is a contract remedy, party cannot pursue takings claim in this Court); Buse Timber & Sales, Inc. v. United States, 45 Fed. Cl. 258, 263 (1999) ("the express terms of the contract define the parties' respective rights and responsibilities which address the eventualities at issue before this court," precluding a taking claim). In short, there are no extra-contractual rights that arise from the failed performance of a contract, just damages that accrue from the breach. Castle v. United States, 301 F.3d 1328, 1341-43 (Fed. Cir. 2002) ("[v]irtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance") (citing Winstar v. United States, 518 U.S. 839, 919 (1996) (Scalia, J., concurring)).

### D. SFI's Claim That, By Failing To Begin Removal Of SFI's SNF From SFI's Waterford 3 Plant By The Contractual Deadline, The Government Has Taken Its Real Property, Is Nothing More Than A Breach Of Contract Claim, Which Cannot Be Recharacterized As A Taking

SFI asserts that DOE's "failure and refusal to comply with the requirements of the Standard Contract for acceptance and disposal of SFI's SNF constitutes a taking of SFI's vested real property rights." Compl. ¶ 33. It alleges that this "failure to honor its commitments under the Standard Contract will prevent SFI from" taking actions with respect to its real property that it otherwise would. Id. SFI contends that the delay has "deprived, and will continue to deprive, SFI of the full valuable economic use of that site." Id. SFI thus seeks damages to compensate it for the alleged taking of its property.

Another Standard Contract holder, Commonwealth Edison Company ("ComEd"), pursued a takings claim alleging that the Government's breach of the Standard Contract prevented ComEd from decommissioning its nuclear plant sites and depriving it of the commercial use of its real property. Commonwealth Edison Co. v. United States, 56 Fed. Cl.

652, 654 (2003). However, this Court rejected ComEd's claim in its entirety, even though ComEd, like SFI, claimed that it had rights in its real property that were "separate and distinct" from its rights under the Standard Contract, finding that, "prior to the Standard Contract DOE did not have an obligation to accept or dispose of [ComEd's] SNF." Id. at 656. Because ComEd would have been obligated to conduct the same or similar storage activities that it had asserted gave rise to a takings claim, this Court found that ComEd's rights were enforceable through a contract remedy and dismissed ComEd's takings claim. Id.; see Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (unpublished) (dismissing Standard Contract holders' takings claims, finding that "plaintiff's taking claim is grounded on the SNF contracts that [plaintiffs] executed with the United States").[9]

Indeed, as previously discussed, any rights that SFI possesses with regard to DOE's removal of its SNF were conferred upon it by the Standard Contract. See Commonwealth Edison, 56 Fed. Cl. at 656. Absent the Standard Contract that SFI executed with DOE, DOE would have no responsibility to accept SFI's SNF. SFI cannot divorce its Standard Contract from its new claim that the contractual delay in beginning SNF acceptance somehow constitutes a taking of its real property. As previously discussed, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have

[9] This Court reserved judgment upon whether the plaintiff could state a claim for a taking under the Standard Contract in Detroit Edison Company v. United States, 56 Fed. Cl. 299 (2003). Although we respectfully disagree with the decision in Detroit Edison, even the reasoning in that case does not prevent the Government from prevailing upon its motion in this case. In Detroit Edison, the Court chose not to dismiss the takings claim at that "point in the litigation" because a "more fully developed record" would allow it to assess whether the property right implicated was outside of the rights granted under the Standard Contract. Id. at 302-03. The court rejected the contention that Detroit Edison could use its takings claim to obtain remedies unavailable to it pursuant to the Standard Contract. Id.

been voluntarily created by contract." Sun Oil, 215 Ct. Cl. at 769-70, 572 F.2d at 818. Because its claim for a taking of its real property is wholly dependent upon the existence of its Standard Contract, and because SFI would have been wholly responsible for the storage and disposal of its SNF absent its Standard Contract, SFI's claim for an uncompensated taking pursuant to the NWPA fails as a matter of law.

Some plaintiffs in the SNF cases have suggested that the appellate court's decision in Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003), supports a contract holder's right to pursue both a takings claim and a breach of contract claim. This Court recently addressed the application of Cienega Gardens and concluded that a takings claim is not permitted when the contract at issue is with the Government and the Government is the breaching party. See Allegre Villa v. United States, 60 Fed. Cl. 11 (2004). The plaintiffs in Cienega Gardens had entered into loan agreements with third parties that were insured by the Department of Housing and Urban Development. The Government subsequently restricted the plaintiffs' prepayment rights in those contracts. Because their contracts were with third parties, the plaintiffs in Cienega Gardens were not in privity with the Government and, therefore, had no contract claim against the Government. Consequently, the plaintiffs in Cienega Garden were allowed to proceed upon a takings theory because they had no contract with the Government upon which to base a breach of contract claim and had property rights that were created outside of a contractual relationship with the Government. Conversely, because the plaintiff in Allegre Villa had a contract with the Government and was in privity of contract with the Government, this Court required it to pursue the breach of contract claim and dismissed its takings claims:

> Because their contracts were with private lenders, plaintiffs in Cienega Gardens and Chancellor Manor were not in privity with

> the Government; thus, no contract claim against the Government was available to address the subsequent prepayment limitations by the Government. The present action, in contrast, involves plaintiffs that entered into contracts directly with the Government, and such contracts provide a remedy for the later prepayment restrictions.

Allegre Villa, 60 Fed. Cl. at 19. Applying the analysis of Allegre Villa to the facts of this case, SFI's takings claim should be dismissed. SFI is seeking to recover damages based upon rights that it obtained solely through its contract with DOE: a right to acceptance of SNF. Therefore, the Court should enter summary judgment in favor of the Government upon SFI's takings claim.

IV. TO THE EXTENT THAT THE COURT WOULD OTHERWISE GRANT THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY, THE COURT SHOULD GRANT THE UNITED STATES DISCOVERY PURSUANT TO RULE 56(f) BEFORE DECIDING THAT MOTION

In the event that the Court finds that there is not ample evidence to rebut SFI's allegations regarding a liability ruling, the Government respectfully requests that it be permitted to take limited discovery on the relevant issues, pursuant to RCFC 56(f), to further support this motion. See, e.g., Dombrovskis v. Esperdy, 185 F. Supp. 478,484 (S.D.N.Y. 1960); Michael Rose Productions, Inc. v. Loew's Inc., 141 F. Supp. 257, 263 (S.D.N.Y. 1956). Specifically, we have found no evidence in the Government's files to support any argument that SFI understood at any time prior to this litigation that it was entitled to acceptance of its own SNF in 1998 or in an acceptance queue developed outside of the "oldest fuel first" requirement of the Standard Contract. As previously discussed, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni, 41 Fed. Cl. at 591. "One may not ignore the interpretation and performance of a contract, whether termed 'mistake' or not, before a dispute arises." Alvin, 816 F.2d at 1566. "A principle of contract interpretation is that the

contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's, 697 F.2d at 1058.

Here, although we were able to serve extremely limited document production requests upon some third parties in the coordinated discovery proceedings that preceded SFI's complaint in this case, that discovery was not as thorough as that to which we ordinarily would be entitled against a party in litigation. To the extent that the Court finds insufficient information in the Government's arguments and appendix to rebut SFI's entitlement to a ruling on liability, we respectfully request that, pursuant to RCFC 56(f), we be granted a right to conduct discovery against SFI upon these issues.

## CONCLUSION

For the foregoing reasons, the Court should deny SFI's motion for summary judgment regarding liability and grant our motion for summary judgment upon Counts I and II of plaintiff's complaint and our motion to dismiss Count III of plaintiff's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester. Jr.
HAROLD D. LESTER, JR.
Assistant Director
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

July 28, 2004

CERTIFICATE OF FILING

I hereby certify that on July 28, 2004, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT, AND DEFENDANT'S MOTION TO DISMISS COUNT III OF PLAINTIFF'S COMPLAINT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.