Houston Lighting and Power Company Comments on
the Proposed Standard DOE Contract for
Disposal of Spent Nuclear Fuel and High Level Radioactive Waste

1. Proposed 10CFR Part 961.4 - Deviations

The DOE's intent to allow deviations from the standard contract should be emphasized by adding a statement indicating that "the DOE recognizes that some situation may require special contractual provisions". This sentence should be added to the beginning of Part 961.4.

2. Article I

The "Assigned Three-Month Period" should be set by mutual agreement between the DOE and the Purchaser, rather than assigned by the DOE. This would allow the Purchaser to choose the end date most consistent with its internal record keeping system.

3. The term "shipping lot" as defined in Article I and as used in Appendices B, C, D and F should be clarified. It is unclear whether this refers to a single or multiple shipment of spent fuel.

4. Article II

There should be a provision in the contract whereby the DOE commits, on an annual basis beginning January 31, 1998, to accept title to a quantity of spent nuclear fuel or high level radioactive waste greater than or equal to the quantity projected to be generated during a given year. Otherwise, the utilities have no assurance as to when the DOE will actually begin to take title to spent nuclear fuel from their individual nuclear plants.

5. Article IV.B.

The Delivery Commitment Schedule, to be submitted 63 months prior to the delivery, is much too restrictive. This commitment should be eliminated or, as a minimum, the flexibility to the Purchaser should be increased. This flexibility could be increased by reducing the commitment leadtime to 36 months and/or increasing the quantity adjustment to ±35% (instead of ±20%).

The annual discharge forecasts to be provided by Purchaser should be sufficient for planning repository capacity.

6. Article V.A.2.c

The Purchaser should only be responsible for the incidental maintenance normally required during the cask loading process. Also, the Purchaser should only be liable for any loss or damage to the cask caused by the Purchaser's negligence.

83-1-66

MIDDLE SOUTH SERVICES, INC./BOX 51000/NEW ORLEANS, LA. 70161/(504) 529-5262

March 7, 1983

Mr. Robert Morgan
Project Director, Nuclear Waste
Policy Act Project Office
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

SUBJECT: Comments on Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste

Dear Sir:

Middle South Services, Inc. would like to take this opportunity to comment on the Department of Energy's Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste - 10CFR961. The attached comments are being submitted on behalf of System Fuels, Inc., the fuel subsidiary and the three nuclear operating companies of the Middle South Utilities System: Arkansas Power & Light, Co. (AP&L), Louisiana Power & Light, Co. (LP&L) and Mississippi Power & Light, Co. (MP&L). In addition to these comments AP&L, LP&L, and MP&L will be submitting comments.

These comments are intended to enable DOE to provide information to the NRC pursuant to Section 302 (b) (ii) of the Act that Middle South Services, Inc. (MSS) is in good-faith negotiations with DOE. We request that DOE affirm in writing that MSS and DOE are actively involved in such good-faith negotiations for contracts for the disposal of spent nuclear fuel for the Grand Gulf Nuclear Station Unit 1 and the Waterford Steam Electric Station Unit 3. However, if further input is required from MSS in order that the Department be able to render the aforementioned affirmation to the Commission, please advise us immediately.

If you wish to discuss any of our comments or would like clarification on any comment please contact us.

Sincerely,

Felix M. Killar, Jr.
Felix M. Killar, Jr.
Manager, Nuclear Fuel Supply

FMK/tb

cc: Dr. T. W. Schnatz
Mr. S. Thompson
Mr. T. L. Temple
Ms. S. M. Temple
Mr. J. S. Brihmadesam
Mr. R. T. Lally
Dr. K. R. Iyengar
Mr. J. Patterson
Nuclear Fuels Commitee
Nuclear Oversight Committee

File: 037-14
041-01

COMMENTS ON CONTRACT FOR DISPOSAL OF

SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE

In addition to the following specific comments we also endorse the comments being submitted by the Utilities Nuclear Waste Management Group and Edison Electric Institute.

RECITALS

The wording for identification of purchaser should allow for lead utility to act on behalf of itself and co-owners in the plant and/or to allow a service organization to act on behalf of the plant owners.

ARTICLE I - DEFINITIONS

General comment - Terms which are defined should be capitalized throughout the Contract and not just in Article I.

1. The term "Assigned Three-Month Period" should be negotiated with each Purchaser so that it coincides with that utility's internal bookkeeping and reporting requirements. This will avoid duplication of effort.

2. The term "Commission" should be expanded to include" or any successor thereto".

3. The term "Delivery Commitment" should be deleted. Defining this as a "promise" introduces ambiguity as to whether this is a contract commitment or a non-binding planning arrangement. The "Delivery Commitment Schedule" described in Article IV.B is the applicable term.

4. The term "Delivery" should include "f.o.b. carrier" between custody and of.

5. The term "DOE" should should be expanded to include "or any successor thereto"

6. The term "DOE Facility" needs to be expanded to include any holding facilities which may be used prior to the SNF/HLW arriving at the actual disposal facility. This change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility.

7. The term "Full Cost Recovery" should be more precisely defined to ensure that funds are applied only to activities authorized by the Nuclear Waste Policy Act of 1982. Hence, delete the words "and conducting related activities" in the first sentence of this definition. The second sentence should be modified as follows:

ARTICLE V - RESPONSIBILITIES OF THE PARTIES

1. The penalty imposed by Article V.A1(b) seems disproportionately harsh for failure to provide an annual ten year forecast. This penalty should be deleted.

2. In Article V.A. 2(a) the Purchaser is obliged to afford "access" to DOE's representative at Purchaser's site. This should be revised to read Purchaser shall afford reasonable access to such representative subject to such representative's compliance with appropriate procedures regarding safety, security, and non-disruption of normal operation of the nuclear powerplant".

3. Change the first sentence of Article V.A.2 (c) to read as follows:

   "The Purchaser shall be responsible for incidental maintenance, protection and preservation of any and all shipping casks. . ."

4. In Article V.A.2(c), second sentence, general comment - The liability as written is too broad. Only in the event of Purchaser's negligence should there be any liability. The ambiguous phrase" . . . expenses incidental to such loss or damage . . ." could include consequential damages and should be deleted. Also, revise this section to make it clear when liability and risk of loss transfer between Purchaser and DOE. We suggest the provision be redrafted as follows:

   "Purchaser shall be liable for loss or damage caused by Purchaser's negligence while such casks are in the possesion and control of Purchaser. Liability and risk of loss transfer from DOE to the Purchaser upon Purchaser's receipt and acceptance of DOE's cask at the Purchaser's site. Liability and risk of loss revert to DOE when the cask and its contents are transferred to DOE f.o.b. DOE's carrier."

5. Article V.B.1 should be deleted as it is somewhat inconsistent with Articles IV.B and C and is unnecessarily redundant to the previous Articles.

6. Article V.B.2, general comment - Add "DOE shall provide drawings, instructions, procedures and any other such descriptive technical information as well as any special tools or equipment necessary for Purchaser to make use of DOE's cask in accordance with all applicable regulatory requirements and other procedures and instructions. Purchaser shall have the right to request from DOE specific cask types from among those available." The provision should also state that casks arrive in good condition and good repair and shall be subject to receipt inspection and acceptance by the Purchaser, such acceptance shall not be unreasonably withheld.

7. Article V.B.5, general comment - To assist in planning, DOE should provide in its reports 10 year forward projections of its receiving capacity and purchaser allocations of that capacity. DOE should also provide annually a detailed financial statement rendering the status of the Nuclear Waste Fund. DOE should periodically meet with the Purchaser to discuss plans and budgets for the Nuclear Waste Fund and technical plans and schedules for the waste disposal program. Finally, DOE should provide to Purchaser the results of any research funded by the Nuclear Waste fund.

83-1-67

VERMONT YANKEE
NUCLEAR POWER CORPORATION

RD 5, Box 169, Ferry Road, Brattleboro, VT 05301

(802) 257-5271

March 7, 1983

Mr. Robert Morgan, Project Director
Nuclear Waste Policy Act Project Office
U. S. Department of Energy
1000 Independence Avenue, SW, Room 7B-084
Washington, D.C. 20585

Dear Mr. Morgan:

Subject: Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (48 F.R. 5458; Friday, February 4, 1983; 10 CFR 961)

By Notice of Proposed Rulemaking published in the Federal Register on February 4, 1983 (48 Federal Regulations, 5458), the Department of Energy (DOE) requested comments on a proposed standard contract to be used by DOE in furnishing disposal services for spent fuel and/or high-level radioactive waste to the owners and generators of such material. In addition, comments were solicited on DOE's proposed procedures for implementing Section 302 of the Nuclear Waste Policy Act of 1982. Vermont Yankee (VY) hereby respectfully submits for DOE's consideration its comments on the proposed standard contract. Ten copies of VY's comments are enclosed.

VY recognizes that the Nuclear Waste Policy Act of 1982 requires the collection by the DOE of fees for disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). Before commenting on particular terms of DOE's proposed contract, VY has a basic general concern. We will be required to make substantial advance payments for nuclear waste disposal long before the DOE has an operating disposal facility or even an approved plan or site for such a facility. VY's advance payments will be included in the cost of power from its plant and will ultimately be paid by electric customers throughout New England. We have a duty to these customers to assure that DOE is fulfilling its end of our bargain. Although VY would be contractually required to begin making payments to DOE in mid-1983, DOE will not be required to begin fulfilling its obligations until 1998. In order for this contract to be a serious commitment for all parties, we believe that DOE should use its best and most expedient efforts

VERMONT YANKEE NUCLEAR POWER CORPORATION

Mr. Robert Morgan
March 7, 1983
Page 2

to construct and operate a disposal facility as soon as possible. Signing of this contract by United States utilities does not alleviate the need for an expeditious resolution of the waste disposal issue. The DOE should not have 1998 as a goal but rather as an outer limit. Therefore, we request that DOE include in this contract, best effort commitments to meet a progress schedule that results in operation of a waste disposal facility before the 1998 deadline.

We endorse the comments prepared by the Edison Electric Institute in cooperation with representatives of the utility industry, including VY. We believe that those comments can serve as the basis for development of a workable contract from the standpoint of both the DOE and the purchasers of disposal services. In addition, we wish to emphasize the following points:

1. Fee for Spent Fuel

   a. Fee for Fuel Used to Generate Electricity Prior to April 7, 1983 (existing spent fuel)

      We support the fee calculation method proposed as Alternative 2 in the Notice of Proposed Rulemaking 48 FR, Pages 5459 and 5460. Our support is based on the fact that the fee thus charged for pre-April 7, 1983 SNF will be based on actual energy generation for each reactor and thus will most accurately equilibrate to the fee basis for post-April 6, 1983 SNF. As a result, Alternative 2 will be the most equitable and consistent method for charging waste disposal costs for all SNF to the ultimate consumers of energy generated by each contracting utility's nuclear reactor(s).

   b. Fee for Spent Fuel in Core as of April 7, 1983

      To be consistent with the charges to be assessed for generation after April 7, 1983, we suggest that each utility indicate the number of kilowatt hours already generated by the fuel in-core on April 7, 1983 and assign a 1 mil/kwh fee to this generation. This would be more equitable and easier to administer than the method in Article VIII.A.4 of the proposed contract.

Please give all due consideration to inclusion of these comments in the final version of the waste contract.

Respectfully yours,

William F. Conway

William F. Conway
President and Chief Executive Officer

WFC/jh

83-1-69

Con Edison
Consolidated Edison Company of New York, Inc.
4 Irving Place, New York, N.Y. 10003

March 7, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act Project Office
Department of Energy
1000 Independence Avenue, S. W.
Room 7B-084
Washington, DC 20585

Dear Mr. Morgan:

The Consolidated Edison Company of New York, Inc. commends DOE for its rapid preparation of the Draft Contract for Disposal of Spent Nuclear Fuel And/Or High-Level Radioactive Waste, in application of the Nuclear Waste Policy Act of 1982. Our Company has long supported the efforts which resulted in the passage of this legislation.

Accordingly, we are pleased to offer our general comments on this Draft Contract and, following these, various editorial comments which we hope will be of assistance.

(1) As this contract provides for considerable pre-payments over a period of nearly two decades, it would be most helpful if DOE's performance was as precisely defined as possible. Presentation by DOE of the "Mission Plan", in the Spring of next year, may provide such an opportunity. In any event, the Purchasers should be kept informed of DOE's views, as they develop, concerning the detailed schedule of its performance under the contract.

(2) For the sake of simplicity, we suggest that fuel in-core through April 6, 1983 be charged 1 mill/kwhr for the energy produced by then (Ref. Article VIII A-4). The words in the Draft Contract imply that such fuel will be treated in the same way as already discharged fuel.

(12) Appendix "G"

Section III.a.

Delete the word "power", replace by the word "energy".

(13) General Comments

Consolidated Fuel Rods

The contract is vague on the treatment and charge(s) for these type fuel rods. These items should be clarified in the contract.

Control Rods

The contract is silent on the disposal of cruciform control rods. This is an important item for older reactors, such as our Indian Point Unit 1, which utilized such control rods.

(14) 10 CFR Part 961

Article VIII

The method of calculating the heat output of each assembly should be the object of reasonable mutual agreement.

We appreciate the opportunity to comment and we trust that our comments will be reflected in the final contract. Any further details specific to Con Edison fuel will be addressed in negotiation.

Very truly yours,

Henri M. Gueron

Dr. Henri M. Gueron
Director
Nuclear Fuel & Coal Supply

HMG/dl

83-1-77

DAIRYLAND POWER COOPERATIVE • P.O. BOX 817 • 2615 EAST AV SOUTH • LA CROSSE, WISCONSIN 54601
(608) 788-4000

FRANK LINDER
General Manager

March 7, 1983

Ref: GM-352

U. S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D. C. 20585

Attention: Mr. Robert Morgan, Project Director
Nuclear Waste Policy Act Project Office
Room 7B-084

Subject: U. S. Department of Energy
10 CFR Part 961
Standard Contract for Disposal
of Spent Nuclear Fuel and/or High
Level Radioactive Waste - Comments

Gentlemen:

We have reviewed the notice of proposed rulemaking on,

1) Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Waste

2) Nuclear Waste Policy Act of 1982 - Proposed Rule for General Guidelines for Recommendation of Sites for Nuclear Waste Repositories

and submit the following comments with respect to item 1) above:

Dairyland Power Cooperative is the owner and operator of the La Crosse Boiling Water Reactor (LACBWR), a relatively small 50 mWe reactor plant, which was designed and built by the Allis-Chalmers Manufacturing Company for the U. S. Atomic Energy Commission. The reactor plant was built as part of the AEC's second round demonstration program and first achieved criticality in July 1967.

The conventional power generating facilities associated with the reactor plant were built by Dairyland Power Cooperative. We also provided the staff to manage, operate and maintain the integrated plant.

Following a lengthy testing and break-in period, the plant was declared operational for contract purposes in November 1969. After several years of experience as an operational nuclear power plant, LACBWR was sold to Dairyland in August 1973.

We are currently operating the plant under the terms and conditions of a Provisional Operating License and are entering the final stages of obtaining a Full Term Operating License.

Because of the relatively small size of the plant, hence the smaller size of the fuel assemblies, relatively lower average burn-up of the fuel, the relatively higher enrichment and therefore potentially higher salvage value of the fuel and the unique contract arrangements which existed between the AEC and DPC regarding payments for the use of nuclear generated steam, there appear to be sufficient differences which merit discussions prior to our execution of a SNF, HLW disposal contract. From first criticality in July 1967 to August 1973 the reactor was producing steam as a government-owned facility.

Text

Change the statement - "whereas the DOE is authorized to enter into contracts for the permanent disposal. . ." to read ". . . long term disposal. . ."

Articles II-III

1) Article II specifies that contract termination shall take place at "such time as all SNF and/or HLW. . . has been disposed of . . ." Article III states that the contract shall terminate at "such time as DOE has accepted SNF and/or HLW." The termination event should be consistently defined.

2) The words "the Purchaser's" should be inserted before "civilian nuclear power reactors."

3) In Article III, the word "all" should be inserted before "SNF and/or HLW."

Article IV

1) In Section B, it is unclear whether DOE's written approval would be required for 1) adjustments to delivery quantities, 2) adjustments to delivery scheduled and 3) changes of specific assemblies, or only for changes of specific assemblies.

2) It should not be necessary to submit firm (within + or - 20%) delivery commitment schedules sixty-three (63) months prior to the delivery date. Thirty-six to forty-eight months would be more reasonable. In any case, the Purchaser should be allowed to delay the delivery and/or change the form of the delivery from SNF to HLW up to 12 months prior to the delivery date if the option to reprocess the SNF becomes available.

Article V

In Section B.2, DOE shall "arrange for shipping casks to be furnished. . ." In LACBWR's case, only two fuel assemblies can be shipped in a NSF-4 or similar cask. Schedule commitments would presume a compressed schedule utilizing multiple casks to efficiently coordinate a transfer campaign.

2) Instruction for completing DOE Remittance Advice, Section III, second sentence should read ". . . specifying the net amount of power metered through each plant. . ." instead of ". . . specifying the gross amount of power metered through each plant. . ."

3) Standard Remittance of Advice (RA) for Payment of Fees. Item III typographical error - change "spearate" to "separate".

Appendix H

1) The Disputes section provided procedures for dispute resolution based on the Contract Disputes Act. That statute, however, is not applicable to this type of contract. The terms in Appendix H limiting the procedures and forum for resolving disputed matters conflict with the language of Article XI, which states that neither party shall be precluded from asserting its rights and remedies under the contract or at law.

2) The copy of Draft Contract provided concluded with a handwritten title, "6. Rights in Technical Data." Without further information, we are unable to comment on that subject.

Appendix I

The fee calculation formula is based on the on-hand amount of SNF and/or HLW derived from SNF, which fuel was used to generate electricity in a civilian nuclear power reactor prior to April 7, 1983. Much of the SNF and/or HLW at LACBWR resulted from operation of an AEC facility, not from electrical generation in a civilian nuclear power reactor, as that term is defined in Article I. Thus, the applicability of the fee to that material at LACBWR is unclear.

It is our intention to contact the office of the Project Director in the near future to schedule discussions relative to our comments and to initiate negotiations for a contract for DOE's disposal services.

Very truly yours,

Frank Linder

FWL:daj

Attachments (2)

cc: O. S. Hiestand
Morgan Dubrow - NRECA
E. Tremmel
S. Raffety
J. Taylor
R. Mueller
R. Shimshak
Jeff Hill - Office of Information and Regulatory Affairs
Office of Management and Budget
Washington, D. C. 20503

83-1-78

Georgia Power Company
333 Piedmont Avenue
Atlanta, Georgia [illegible]
Telephone [illegible]

Mailing Address:
Post Office Box [illegible]
Atlanta, Georgia [illegible]

J. T. Beckham, Jr.
Vice President and General Manager
Nuclear Generation

Georgia Power
the southern electric system

NED-83-145

March 4, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act
Project Office
U. S. Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D. C. 20585

Subject: Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste

Gentlemen:

Georgia Power Company ("Georgia Power") is hereby submitting its comments on the proposed rulemaking contained in 48 Federal Register 5458 entitled "Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste." Georgia Power is a public utility providing electric service at retail and wholesale in the State of Georgia, and operates the Edwin I. Hatch Nuclear Plant on behalf of itself and its co-owners. Georgia Power also has under construction the Alvin W. Vogtle Nuclear Plant which also has co-owners. We are, therefore, vitally interested on behalf of Georgia Power, its co-owners, and its customers in the contract proposed to be adopted by the Department of Energy ("DOE") as the standard contract for disposal services to be provided pursuant to the authorization of the Nuclear Waste Policy Act of 1982 (the "Act").

In general, Georgia Power supports the comments filed in connection with this proposed rulemaking by the Edison Electric Institute ("EEI") and, in fact, participated in their development. In a few instances, however, as pointed out below, as an individual utility we favor approaches different than those supported by EEI, particularly regarding the proposed fee for electrical generation prior to April 7, 1983. In other instances we are commenting specifically on particular items in which our views coincide with those presented by EEI. Our additional comments are intended to highlight items of particular importance to us and not to suggest that other items on which EEI commented are not equally deserving of consideration.

Georgia Power

Mr. Robert Morgan
March 4, 1983
Page Eight

8. Delays Clause - Article IX

We are concerned by the ambiguity of Article IX of the proposed standard contract. This section of the proposed agreement is intended to excuse delays, not to excuse failures to perform. The first sentence of Article IX should be revised as follows:

> Neither the Government nor the Purchaser shall be liable under this contract for damages caused by delays in the performance of its obligations hereunder, if such delay arises out of causes beyond the control and without the fault or negligence of the party delayed.

This change will make this sentence consistent with the last sentence of Article IX, which requires the parties to perform, notwithstanding excused delays, on an adjusted schedule.

9. Spent Fuel Receipt Rate at DOE Facility

The draft contract recognizes that the annual capacity of the DOE disposal facilities may not be adequate to handle the level of deliveries of spent nuclear fuel desired by the holders of such fuel. In this regard, it is important that the annual receipt rate of the disposal facility being designed be commensurate with the quantities of spent nuclear fuel being generated annually and also the need to reduce the back-log of spent fuel as expeditiously as possible. Consistent with Section 302(a)(5) of the Act, the contract should express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon request of the generator or owner.

In addition, we support EEI's comments on the proposed priority system for allocation of spent fuel shipments and the concepts of allowing exchanges of such allocations between different Purchasers. Clearly, such allocation exchanges should be permitted between reactor units on Purchaser's own electric system.

Conclusion

Georgia Power Company appreciates this opportunity to provide comments on the draft standard contract. We respectfully request that DOE consider these comments and provide a contract which will be fair and workable to the nuclear utilities, such as Georgia Power, who will have to operate under the contract.

Very truly yours,

J. T. Beckham, Jr.

LTG/mb

Comments on Contract for Disposal of
Spent Nuclear Fuel and/or High-Level Radioactive Waste

ARTICLE I - DEFINITIONS

1. The term "Assigned Three-Month Period" should be negotiated with each Purchaser so that it coincides with that utility's internal bookkeeping and reporting requirements. This will avoid duplication of effort.

2. The term "Delivery Commitment" should be deleted. Defining this as a "promise" introduces ambiguity as to whether this is a contract commitment or a non-binding planning arrangement. The "Delivery Commitment Schedule" described in Article IV.B is the applicable term.

3. The term "Full Cost Recovery" should be more precisely defined to ensure that funds are applied only to activities authorized by the Nuclear Waste Policy Act of 1982. Hence, delete the words "and conducting related activities" in the first sentence of this definition. The second sentence should be modified as follows:

   "As used herein, the term 'Cost' includes the application of fees for those used expressly set forth in sections 302(d) and (e) of the said Act."

4. The term "Kilowatt Hours Generated and Sold" should be restricted to electricity generated by nuclear fuel and should exclude any fossil fuel generation from the plant.

ARTICLE II - SCOPE

1. This section should be expanded to recognize that DOE is also responsible for accepting title to the spent nuclear fuel and/or high-level waste (SNF/HLW), for providing transportation of the material, and for disposal of the material.

ARTICLE III - TERM

1. In accordance with Article VI.B.1, DOE accepts the SNF/HLW at the Purchaser's site. The term of the contract should be adjusted to include the acceptance and transportation from the Purchaser's site by DOE of the SNF/HLW.

ARTICLE IV - DELIVERY OF SNF and/or HLW

1. In Article IV.B, a time limit should be provided for DOE's acceptance of a revised schedule from the Purchaser. It is suggested that this time limit be 30 days. A similar adjustment should be made to Article IV.C.