IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SYSTEM FUELS, INC. on its own behalf and, as agent for ENTERGY LOUISIANA, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2621C (Judge Williams) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND MOTION TO DISMISS COUNT III OF PLAINTIFF'S COMPLAINT

Defendant, the United States, respectfully submits this reply to "Plaintiff's Reply in Support of its Motion for Summary Judgment and Response In Opposition To The Defendant's Motion For Summary Judgment Upon Counts I and II of Plaintiff's Complaint and Motion To Dismiss Count III Of Plaintiff's Complaint," dated September 2, 2004.

## DISCUSSION

### I. IN RESPONSE TO THE GOVERNMENT'S CROSS-MOTION, SFI DID NOT PRESENT ANY EVIDENCE OF DAMAGE TO PRECLUDE SUMMARY JUDGMENT IN THE GOVERNMENT'S FAVOR UPON LIABILITY FOR BREACH OF CONTRACT

#### A. Incorrectly Assuming That "Breach" And "Liability" Are Synonymous Terms, SFI Has Failed To Present Any Evidence Of Damage Resulting From DOE's Delay In Beginning Spent Nuclear Fuel Acceptance From Other Contract Holders

In its response to our cross-motion for summary judgment, plaintiff, Systems Fuels, Inc. ("SFI"), begrudgingly acknowledges that, under the Standard Contract at issue in this case, the Department of Energy ("DOE") was not obligated to begin accepting SFI's spent nuclear fuel ("SNF") by January 31, 1998. Pl. Reply 10 (stating that, "[h]ad DOE used the appropriate

[acceptance] rate, Plaintiff, in fact, would have had its first deliveries accepted by DOE no later than 2005 (in the eighth year of the waste management system's operation)").[1] As we established in our cross-motion, the "oldest fuel first" allocation method for SNF acceptance from the various contract holders precluded SFI from obtaining any SNF acceptance rights at the beginning of the SNF acceptance queue, both because of the number of contract holders that had allocations ahead of SFI and because of SFI's failure to submit any delivery commitment schedules ("DCSs") seeking a commitment to accept SFI's SNF on a particular date. Def. Br. 8-13. Nevertheless, SFI devotes the majority of its response to our summary judgment motion upon Count I of its complaint discussing the existence of a breach of contract on January 31, 1998. Pl. Reply 5-8, 12-18.

SFI has missed the point of our cross-motion. SFI seeks a dispositive decision here not only upon breach, but upon liability. Yet, as we established in our cross-motion, the existence of a breach is but one component of liability. Def. Br. 5-6. The Court of Claims has recognized that, before a contractor is entitled to judgment regarding entitlement, it must establish as part of its proof that it suffered <u>some</u> damage, beyond mere speculation, because of the Government's actions. <u>Puritan Assocs. v. United States</u>, 215 Ct. Cl. 976, 978 (1977). When considering a summary judgment motion regarding liability, "evidence on damages or quantum is not totally excluded because there must be <u>some</u> evidence of damage to support a finding on liability" that is

---

[1] "Pl. Reply __" refers to plaintiff's reply in support of its motion for summary judgment upon liability and response to defendant's cross-motion for summary judgment upon Counts I and II of plaintiff's complaint and upon Count III of that complaint, dated September 2, 2004. "Pl. Reply App. __" refers to the appendix to that brief. "Def. Br. __" refers to defendant's response to plaintiff's motion for summary judgment upon liability and cross-motion for summary judgment upon Counts I and II and to dismiss Count III of plaintiff's complaint. "Def. App. __" refers to the appendix to that brief. "Def. Reply App. __" refers to the appendix to this brief.

"sufficient to demonstrate that the issue of liability is not purely academic." Cosmo Constr. Co. v. United States, 196 Ct. Cl. 463, 469-70, 451 F.2d 602, 605-06 (1971).

In our cross-motion, we established the absence of any evidence that SFI could have been injured by DOE's failure to begin accepting SNF from other contract holders on January 31, 1998, given that, under any scenario, SFI could not have had any rights to the acceptance of its SNF for many years after 1998. Even under SFI's best argument – that DOE should have been obligated to begin accepting its SNF sometime next year, Pl. Reply 10 – DOE had no obligation to begin accepting SFI's SNF before SFI filed its complaint in this case. In all of its briefing, SFI has presented absolutely no evidence, other than unsupported attorney statements and argument contained in its brief, to support its proposition that it has incurred any damages from DOE's delay in beginning SNF acceptance from other contract holders on January 31, 1998.[2] Although it complains about the effect of "predictable cascading delays" and the "domino effect" of DOE's delay in beginning acceptance by January 31, 1998, Pl. Reply 10, SFI cites nothing to evidence that it, as opposed to other contract holders, has incurred damage.

To refute the Government's summary judgment motion, SFI was required to provide, at a minimum, evidence through declaration detailing facts establishing that it suffered some damage from DOE's failure to beginning SNF acceptance from other contract holders by January 31, 1998. See Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd., 731 F.2d 831,

---

[2] SFI maintains that its incurred costs include "amounts for the design, licensing, and construction of a dry spent fuel storage facility (including the purchase of dry storage casks), at the River Bend nuclear power plant, to allow the plant to accommodate spent nuclear fuel assemblies DOE would otherwise pick up." Pl. Reply 10. Other than counsel's representations in SFI's brief, SFI has provided absolutely no evidence to support these assertions or to establish that they are anything but vague predictions of some future activity in which SFI may engage.

836 (Fed. Cir. 1984). Further, "it is well settled that 'a conclusory statement on the ultimate issue does not create a genuine issue of fact.'" Applied Cos. v. United States, 144 F.3d 1470, 1475 (Fed. Cir. 1998) (emphasis in original) (quoting Imperial Tobacco Ltd. v. Philip Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990)). "Argument and assertion of counsel cannot substitute for factual statements under oath that establish a genuine material issue of fact." Levi Strauss & Co. v. Genesco, Inc., 742 F.2d 1401, 1404 (Fed. Cir. 1984).[3] The absence of any evidence, other than counsel for SFI's self-serving statements of alleged injury, is insufficient to create a genuine issue as to whether SFI has suffered any injury here or to preclude summary judgment in the Government's favor upon liability.

B. SFI Cannot Recover Damages That It Currently Anticipates Incurring In The Future

Given the lack of evidence of present damages, it appears that the only manner in which SFI could recover damages now is by reference to damages that it anticipates it will incur in the future if DOE does not timely accept its SNF. Yet, it is far from clear that DOE will not be able to begin SNF acceptance from SFI when it otherwise would have been obligated to do so. Although DOE currently anticipates that it will not be able to begin SNF acceptance until 2010, it is always possible that, in response to world events, congressional action or other intervening factors could alter that limitation. Def. Reply App. 9-13. Similarly, DOE's increased acceptance of SNF could speed DOE's ability to meet its ability to accept SFI's SNF. Accordingly, it is premature to assume that DOE will partially breach future obligations to accept SFI's SNF.

[3] See Avenal v. United States, 33 Fed. Cl. 778, 784 (1995) ("assertions of counsel cannot substitute for factual statements under oath that establish a genuine issue of material fact"), aff'd, 100 F.3d 933 (Fed. Cir. 1996); Hoch v. United States, 31 Fed. Cl. 111, 114 (1994) (counsel's assertions regarding fact at issue are insufficient to preclude summary judgment).

In this case, SFI is claiming a partial, not a total, breach of contract. "While in the case of a total breach the injured party can at once get judgment for his entire injury," 9 A. Corbin, Corbin on Contracts § 946, at 720 (interim ed. 1979), the non-breaching party may be entitled to "elect to regard the breach as partial, proceed with his own performance, sue for the partial injury, and maintain a second suit in case a further breach occurs." Id., quoted in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 648 (2004); see Coughlin v. Blair, 41 Cal. 2d 587, 598, 262 P.2d 305, 311 (1953) ("even if a breach is total, the injured party may treat it as partial, unless the wrongdoer has repudiated the contract"). "If the injured party elects to or is required to await the balance of the other party's performance under the contract, his claim is said instead to be one for damages for partial breach. For example, an injured party who claims damages in addition to specific performance claims damages for partial breach." Restatement (Second) of Contracts § 236 cmt. b, at 214 (1981).

When a plaintiff elects to treat a breach of contract only as a partial breach, "[i]t has been thought that where there has been no repudiation, the plaintiff can recover damages for his injury only to the date of the writ – that he must treat the breach as only 'partial.'" 9 A. Corbin, supra, § 956, at 747 (emphasis added). Specifically, if the non-breaching party elects to treat a breach as a partial breach, "he is entitled to maintain an action for damages sustained from breaches up to the time of the institution of the action, and the judgment does not preclude a further action by him for a breach occurring after that date." Restatement (Second) of Judgments § 26 cmt. g, at 241 (1982) (emphasis added); see Kaiser v. Northwest Shopping Ctr., Inc., 587 S.W.2d 454, 457 (Tex. Civ. Ct. 1979) (under Texas state law, plaintiffs seeking damages for partial breach may

recover damages incurred through date of filing the pleading).[4] To the extent that SFI's claim is based upon damages that it may incur in the future from future failures of DOE to accept its SNF, those damages and those future partial breaches are not at issue in this case.

C. Even If SFI Had Established Some Damage Under Its Theory Of DOE's Obligations, Its Theory Of DOE's Obligations Is Incorrect

In addition to SFI's failure to identify any evidence of damage, SFI's arguments regarding its rights to SNF acceptance are wrong. As we established in our cross-motion, any injury that SFI could incur from delays in SNF acceptance would result from DOE's failure to accept SFI's SNF as identified in SFI's approved delivery commitment schedules ("DCSs"). Def. Br. 8-13. The contract provision defining the contract's "Scope" expressly states that any SNF to be accepted "shall be specified in a [DCS] as provided in Article V . . . ." 10 C.F.R. § 961.11, Art. II. Yet, as previously established, SFI did not submit any DCSs that required DOE to begin SNF acceptance under SFI's Standard Contract. Although SFI seems to complain that the DCS process envisioned by the Standard Contract is meaningless and unenforceable, SFI has failed to identify any other means by which the activities contemplated by the Standard Contract could ever proceed. Under SFI's theory, DOE will magically know when each contract holder wants

[4] In Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), this Court held that damages in a partial breach case could be recovered up to the date of trial, rather than the date of the filing of the complaint. Id. at 648 (citing cases). Given that this Court's jurisdiction is determined by the circumstances existing upon the date that the complaint is filed, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 571 n.4 (1992) (post-filing conduct cannot create jurisdiction that did not exist at outset of litigation); Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989) ("[t]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed"), and given the problems that will always arise in identifying and verifying claimed damages incurred between the conclusion of fact discovery and the commencement of trial, the rules identified in the Restatement (Second) of Contracts and Restatement (Second) of Judgments, establishing an end date for damages for a partial breach at the filing of a complaint, appear correct.

SNF accepted; each contract holder's desires will magically correspond to the "oldest fuel first" requirements of the Standard Contract; DOE will have no problems simply taking SNF from every contract holder when they want acceptance regardless of space, capacity, staffing, or transportation limitations; and DOE will have no problem with the significant financial repercussions and waste that it will suffer if a contract holder is not prepared to deliver SNF to DOE when DOE arrives at the contract holder's site with the appropriate transportation casks contemplated by the Standard Contract. By reading the DCS process out of the Standard Contract, SFI has eliminated the only mechanism that would allow the parties to plan for, and commit themselves to, actual performance under the Standard Contract. Without enforcement of the DCS provisions, the Standard Contract cannot work.[5]

Similarly, SFI complains that the Court should ignore the 1995 Acceptance Priority Ranking/Annual Capacity Reports ("APR/ACR"), which identified the SNF allocations that DOE anticipated it would be able to commit itself to satisfying during the first 10 years of SNF acceptance and which did not identify any allocations for SFI in the first 10 years of SNF acceptance, because the allocations there are "counterfeit." Pl. Reply 9; see 10 C.F.R. § 961.11, Art. IV.B.5 (identifying requirement for issuance of APR and ACR). First, SFI's assertion that these allocations are "counterfeit" is unfounded. The 1995 APR/ACR contains the same acceptance rates as the 1991 ACR and the 1992 ACR, compare Def. App. 411 & 473 with Def.

---

[5] SFI suggests that the submission of "a DCS form was not a condition precedent to DOE's obligation to take SNF from Plaintiff under the Standard Contract." Pl. Reply 13. Yet, absent SFI's submission of a DCS and DOE's approval of it, SFI has not identified any practical manner in which activities contemplated under the Standard Contract, including the significant development time necessary for DOE to prepare transportation casks and coordinate their use for SNF acceptance from various contract holders, see 10 C.F.R. § 961.11, Art. IV.B.2, could ever be performed.

App. 294, and, in fact, contains a higher rate than the "lower bounding case" proposed in the 1990 ACR for use with a Monitored Retrievable Storage ("MRS") facility. Pl. Reply App. 63, 65.

The plaintiff's argument regarding the 1995 APR/ACR is based essentially upon its theory that, once DOE began acceptance and after a short ramp-up period, DOE was contractually obligated to accept 3,000 Metric Tons Uranium ("MTUs") of SNF from contract holders every year. Pl. Reply 9. Yet, it has identified no contract language containing any such requirement, and this Court has recently stated, in response to four SNF plaintiffs' requests that "the contract be reformed to provide an allegedly 'reasonable' post-1998 annual industry-wide acceptance rate of 3,000" MTUs, that this assertion appears unfounded:

> Plaintiffs appear to provide no objection basis for this reformation, relying instead on equitable principles and a widely-shared impression, among jurists and others, that the agency should be punished for transgressing against public safety. None of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations.

Florida Power & Light Co. v. United States, No. 98-483C, slip op. at 9 n.12 (Fed. Cl. Oct. 14, 2004) (Sypolt, J.) (unpublished order).

Further, the acceptance rates contained in various planning documents to which SFI cites at page 9 of its reply brief, including the recently issued 2004 APR/ACR, are generally based upon an assumption that an operating repository will be available when SNF acceptance begins. See also Def. Reply App. 41-42 ("Receipt rates in this table are only applicable if a CISF is approved"). However, as the United States Court of Appeals for the District of Columbia has recognized, DOE was not obligated to have an operating repository available in 1998. Indiana

Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276, 1277 (D.C. Cir. 1996). Instead, it was obligated only to begin SNF acceptance in 1998 in some type of facility, such as an MRS facility, and the Standard Contract expressly permits DOE to accept SNF for delivery to a facility other than a repository. 10 C.F.R. § 961.11, Art. I(10) (defining "DOE facility"); see 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983) (preamble to final rule creating Standard Contract terms: "The definition of 'DOE facility' (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository"). DOE expressly informed contract holders in early ACRs that, beginning with the 1991 ACR, DOE would issue a firm waste acceptance schedule which would be the basis for the submission of delivery commitment schedules ("DCSs") by the purchasers. Each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

Pl. Reply App. 16 (1987 ACR); see Pl. Reply App. 38 (1988 ACR), 60 (1990 ACR); Def. App. 204 (1985 Mission Plan), 408 (1991 ACR), 38-40; see also Def. App. 209 (1987 ACR: "projections in this initial report are based on current plans and best available information; they are not contractually binding"). Given that DOE was entitled under the Standard Contract to

accept SNF at an MRS facility in 1998, rather than directly at a repository, proposed rates for SNF acceptance at a repository do not somehow become contractually binding obligations upon DOE. See National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969) ("[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction"). Accordingly, SFI cannot base its theory of liability upon DOE's obligation to use higher acceptance rates than those that DOE had proposed to use for SNF acceptance at an MRS.[6]

In any event, SFI never contested or complained about those allocations until it filed this lawsuit in late 2003. Its suggestion that it can wait 12 years after the issuance of those acceptance allocations in 1991 and then, and only then, complain that the allocations granted were "counterfeit" and that damages should be based upon some scenario not in existence 12 years earlier. Established precedent of this Court and its predecessor, the Court of Claims, which requires the contractor to protest a material breach of contract upon learning of that breach, or else waive the breach. Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146, 475 F.2d 630, 637 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26, 455 F.2d 546, 551 (1972)); see Aleutian Constructors v. United States, 24 Cl. Ct. 372, 384 (1991); Government Sys. Advisors, Inc. v. United States, 21 Cl. Ct. 400, 411, vacated on other grounds, 25 Cl. Ct. 554 (1990). Further, SFI asks this Court to create a legal fiction excusing its failure to

---

[6] SFI suggests that the Court should use the 2004 ACR that DOE recently published as establishing the mandatory minimum annual acceptance rate to impose into the Standard Contract. Pl. Reply 9. However, the 2004 ACR assumes the existence of a repository in 2010, and the acceptance rates that it contains are based upon that assumption. Pl. Reply App. 144 ("projected nominal acceptance rate is based on the assumption of SNF acceptance beginning in 2010 at the Yucca Mountain Geologic Repository"); Def. Reply App. 29. It certainly is irrelevant to a "mandatory" rate applicable to SNF acceptance at an MRS in 1998.

take action in response to the 1991, 1992, or 1995 ACRs. To obtain any basis for SNF acceptance in 1998, 1999, or any other year, SFI would have had to have submitted a DCS at least 63 months in advance of the desired SNF acceptance date. 10 C.F.R. § 961.11, Art. V.B.1. Accordingly, for a 1998 acceptance, SFI had to submit a DCS in 1992. SFI, in essence, asks this Court to ignore its failure to protest and its failure to submit any DCSs. SFI fails to explain how it ever could have obtained acceptance rights for specific amounts of SNF on specific dates without having complied with the contractual requirements. It has identified no basis for forgiving its failure to protest.

### D. SFI's Explanations About The Reasons It Never Submitted A Delivery Commitment Schedule Are Unsupported

SFI further argues that the Court should not tie any liability ruling to the DCS provisions of the Standard Contract because, it says, any attempt to submit a DCS after 1996 would have been futile because, beginning in 1997, DOE refused to approve or disapprove submitted DCSs. Pl. Reply 16. Yet, SFI could have submitted DCSs in every year beginning in 1992 through early 1997, if it had thought that DOE should dispose of its SNF within the first ten years of SNF acceptance. In fact, many other utilities did just that, beginning in 1992, to establish the amount of SNF that DOE would accept within 63 months of submission of the DCS, beginning January 31, 1998. SFI has submitted no evidence that it declined to submit DCSs because it would be "futile" or because the DCS process was somehow flawed, as it now argues. Instead, SFI had no allocations in the first 10 years of SNF acceptance, Def. App. 415, 477, and did not utilize the Standard Contract's disputes resolution process to challenge the lack of allocations. 10 C.F.R. § 961.11, Arts. V.B.1, V.B.2, & XVI.A. SFI's failure to submit a DCS and challenge any denial

of that DCS under the contract's "Disputes" provision is fatal to its argument here that the Court should allow it to recover damages on some basis other than DCSs.[7]

E. SFI Cannot Recover Damages Prior To DOE's Failure To Accept Its SNF Under A "Pre-Breach Mitigation" Theory

SFI also asserts that, when a non-breaching party is faced with a partial breach, it must mitigate its losses and that it is entitled to recover any mitigation costs incurred prior to the actual partial breach. Pl. Reply 18-22. Aside from SFI's complete failure to provide any evidence of any damages, its attempts to cast any current damages as efforts to mitigate its possible future losses arising from the Government's partial breach are misguided. As we explained in our cross-motion, SFI is claiming a partial breach of contract, not a total breach, and there is no legal doctrine of "anticipatory partial repudiation." Def. Br. 17-19. Apparently recognizing this fact, SFI claims that it is entitled to recover pre-breach mitigation costs. Although, "[a]s a general rule, a party cannot recover damages for loss that he could have avoided by *reasonable efforts*," Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (emphasis in original), costs incurred prior to an actual breach are not incurred solely as a consequence of the breach. At best, such "mitigation" costs might be incurred in anticipation of the possibility that the other party might breach the contract. Given that SFI cannot rely upon an anticipatory repudiation as a basis for supporting any pre-breach damages for a partial breach, it cannot circumvent that rule by arguing that it is entitled to rely on pre-breach "repudiations" to incur pre-breach costs.

[7] To the extent that this Court's decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), conflicts with this position, we respectfully disagree with the Court's conclusions in that case. Further, in that case, the plaintiff had actually submitted DCSs to DOE in the 1990s. Here, SFI simply took no action until it filed this lawsuit in late 2003.

In Middleton v. United States, 175 Ct. Cl. 786 (1966), the Court of Claims rejected the argument that a non-breaching party can recover the costs of "mitigation" efforts that occurred prior to the breach:

> [N]either of the parties here may insist upon an expansion of this concept so as to encompass items which relate to a period *antedating* defendant's breach. Both the defendant's right to a setoff and the plaintiff's duty to mitigate are defined in terms of the same fixed time period; like opposites of the same coin, they are inextricably bound together. Thus, plaintiff could no more seek to reduce defendant's setoff by alleging expenses incurred prior to his discharge, than defendant could enlarge his setoff by seeking the inclusion of income which plaintiff earned prior to his erroneous dismissal. . . . It follows, therefore, that all expenses which arose prior to plaintiff's discharge that he seeks to include, may not be considered within the framework of the setoff question.

Id. at 792 (italics in original; underlining added). To the extent that SFI claims that costs incurred prior to DOE's partial breach are recoverable under principles of mitigation, SFI's arguments are meritless and cannot resurrect its claims for pre-breach damages. See Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 649-51 (2004) (explaining reasons that pre-breach mitigation costs are not recoverable and discussing Chain Belt decision cited by SFI).[8] In any event, SFI has not identified through any evidence that it actually has incurred any "pre-breach mitigation" costs. This absence of evidence precludes summary judgment upon liability in SFI's favor and warrants judgment upon Count I in our favor.

---

[8] In its reply, SFI cites to Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), as supporting its right to recover pre-breach mitigation costs. Pl. Reply 11-12, 20. However, in response to our motion for reconsideration of that decision, in which we argued that the Court should not prejudge whether pre-breach mitigation was available without briefing upon that subject, the Court in TVA issued an order, dated August 12, 2004, stating that our motion was based upon "erroneous premises" and that the Court had not found that the plaintiff could recover damages preceding a partial breach of a specific obligation to the plaintiff there.

## II. SFI HAS FAILED TO PROFFER THE SUBSTANTIAL EVIDENCE NECESSARY TO SUPPORT ITS GOOD FAITH AND FAIR DEALING CLAIM, MANDATING DISMISSAL OF THAT CLAIM

In response to the Government's motion for summary judgment upon SFI's claim for a breach of good faith and fair dealing, SFI asserts that "it can show by clear and convincing evidence that DOE breached the Standard Contract's implied covenant of good faith and fair dealing." Pl. Reply 23. SFI cites to a litany of allegations that allegedly meets the clear and convincing standard and demonstrates that the Government breached the Standard Contract's covenant of good faith and fair dealing borders on the indefensible. Pl. Reply 23-24. SFI points to broad generalizations, such as "DOE's failure to properly implement the DCS process," the "eventual cancellation of the DCS process," the "failure to publish annual APR/ACRs," and "failing to meet the justified expectations of the parties to the Standard Contract" as clear and convincing, or "well-nigh irrefragable proof," that the Government acted in bad faith. Id.

These assertions provide no substantive evidence of any specific malicious intent by DOE to injure this plaintiff or even the nuclear industry as a whole. As we explained in our cross-motion, the presumption that the Government acts in good faith can only be overcome by "clear and convincing evidence" of bad faith, which "has been equated with evidence of some specific intent to injure the plaintiff." Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002); see Franklin Sav. Corp. v. United States, 56 Fed. Cl. 720, 743 (2003) ("presumption can be surmounted only with a proffer of 'well nigh irrefragable proof' of the government's bad faith which requires a showing of the government's specific intent to injure or actual malice on the part of the government toward the plaintiff"), aff'd, 97 Fed. Appx. 331 (Fed. Cir. 2004); Asco-Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595, 604 (1994) ("to state a

claim premised on a violation of the obligation of good faith and fair dealing, plaintiffs must allege facts which if proved would constitute malice or an intent to injure"). To establish that the Government's delay in performance was in bad faith, SFI must present "clear and convincing evidence" equivalent to what is necessary to establish that DOE's conduct was "motivated alone by malice," was "designedly oppressive," or was "actuated by animus toward the plaintiff." Am-Pro, 281 F.3d at 1240.

In response to the Government's motion for summary judgment upon this claim, SFI did not present any evidence, let alone "clear and convincing evidence," to indicate that the Government's delay in accepting SFI's or any other contract holder's SNF was created with an intent to injure SFI. Instead, SFI merely asserted in its brief, through statements of counsel, that the Government's delays should be viewed as constituting malicious intent. As previously discussed, to refute the Government's summary judgment motion, SFI was required to provide, at a minimum, evidence through declaration detailing facts establishing the intent of the Government to injure SFI. See Barmag Barmer, 731 F.2d at 836. Further, "a conclusory statement on the ultimate issue does not create a genuine issue of fact," Applied Cos., 144 F.3d at 1475 (emphasis in original) (quoting Imperial Tobacco Ltd. v. Philip Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990)), and "[a]rgument and assertion of counsel cannot substitute for factual statements under oath that establish a genuine material issue of fact." Levi Strauss & Co. v. Genesco, Inc., 742 F.2d 1401, 1404 (Fed. Cir. 1984).[9]

[9] See Avenal v. United States, 33 Fed. Cl. 778, 784 (1995) ("assertions of counsel cannot substitute for factual statements under oath that establish a genuine issue of material fact"), aff'd, 100 F.3d 933 (Fed. Cir. 1996); Hoch v. United States, 31 Fed. Cl. 111, 114 (1994) (counsel's assertions regarding fact at issue are insufficient to preclude summary judgment).

SFI asserts that DOE's bad faith is self-evident through its implementation of the DCS process. Pl. Reply 24. Although SFI complains that DOE "did not allow utilities to identify 'all SNF and HLW [they wished] to deliver to DOE,' as permitted by the Standard Contract" in DCSs that contract holder utilities submitted, Pl. Reply 24, SFI never responded to DOE's DCS instructions, complained about those instructions, or submitted a DCS. In fact, and importantly, SFI did not have any acceptance allocations in at least the first ten years of the SNF acceptance queue, Def. App. 415, and, given that the acceptance allocations were developed in accordance with the contractual provision that generally requires DOE to accept SNF on an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. IV.B.5(a), SFI has no basis for asserting that it should have had allocations in 1998. Although SFI asserts without foundation that DOE "void[ed]" other utilities' DCSs, Pl. Reply 25, DOE certainly could never have "voided" any SFI DCSs since SFI never submitted any for approval and, further, under the "oldest fuel first" allocation system, had no basis upon which to submit them.[10] Further, SFI has presented absolutely no evidence that

---

[10] Further, no approved DCSs were ever "voided." As Mr. Zabransky, now the DOE contracting officer for the Standard Contract, has testified, when DOE determined that it would not be able to begin SNF acceptance in 1998, it stopped making commitments to accept SNF. Def. Reply App. 32-33. A few DCSs were in the process of being approved when that determination was made had not yet completed the approval process, either not yet having been approved by the contracting officer or not yet having been communicated to the contract holder. See Pl. App. 104-13; Def. Reply App. 33-34. "[I]t has never been doubted that any public officer in the Departments may correct his own errors, and open, reconsider, and reverse in whole or in part any case decided by himself." Rollins v. United States, 23 Ct. Cl. 106, 123 (1888); see Cotton v. United States, 29 Ct. Cl. 207, 225 (1894) ("[w]e have always understood that a public officer could open and reconsider any decision made by himself, like a court"). Even when a final decision is deemed "irrevocable" pursuant to statute or regulation, it becomes irrevocable only when the action described in the final decision has become an "accomplished fact," having been communicated to the interested party and implemented. See, e.g., Comptroller General Warren to the Secretary of War, B-28964, 22 Comp. Gen. 291, 292-93 (1942) ("[s]uch an action may be rescinded at any time before it is consummated by the giving of official notice thereof to the employee, but not thereafter"); Decision by Comptroller General, 3 Comp. Gen. 942, 944,

DOE's decision to suspend approvals of DCSs was made for the purpose of "injuring" SFI. Given that SFI had no acceptance allocations in at least the first 10 years of the SNF acceptance program, see Def. App. 415, and that SFI never submitted a DCS for approval, SFI cannot support an allegation that the suspension of the process was directed with any malicious intent at SFI.

Although SFI asserts that this Court in Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), found that DOE breached its duty of good faith under the Standard Contract, see Pl. Reply 25, SFI has misread that decision. Unlike SFI, TVA had allocations in the first ten years of the repository under the "oldest fuel first" allocation system that the Standard Contract mandates. TVA submitted DCSs to DOE for approval based upon those allocations, but DOE was unable either to approve or to disapprove them. The Court found that, pursuant to Article V.B of the contract, DOE was required either to approve or to disapprove a submitted DCS within three months of receipt and that DOE's failure to do so constituted a partial breach of the Standard Contract. Id. at 674. The Court did not find an intent to injure the plaintiff there or a breach of the duty of good faith and fair dealing.

SFI also cites to Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), as including a finding of "clear and convincing intent to injure" the plaintiff in that case supporting a breach of good faith and fair dealing claim. Pl. Reply 23-24. Although the parties in Commonwealth Edison had not filed any briefing upon the plaintiff's good faith and fair dealing

---

1924 WESTLAW 1178, at 3 (1924) ("before a deduction has been certified to this office for the purpose of raising a charge against the contractor, the Postmaster General may correct his own errors and open, reconsider, and reverse in whole or in part any case decided by himself"). SFI's insinuation that DOE's actions were improper is wholly unsupported. In any event, SFI has made no allegation that DOE voided its DCSs.

claim,[11] the Court there speculated that DOE's use of the 1991 Annual Capacity Report ("ACR") "to limit the amount of SNF requested by the utilities in their DCS submissions may be a breach of defendant's duty of good faith and fair dealing," stating that the acceptance rates in that ACR appeared inconsistent "with the 'justified expectations' of plaintiff." Id. at 665 (emphasis added). Nevertheless, the Court then denied the Government's motion for partial summary judgment regarding the rate of SNF acceptance on other grounds. Id. at 666. With all due respect to the Court's discussion in Commonwealth of the duty of good faith, the Court did not identify in that discussion the well-established requirement of clear and convincing evidence of an intent to injure the plaintiff, eliminating one of the essential components of a lack of good faith claim against the Government, and not intent to injure was identified in the decision.

Further, the plaintiff here has conceded that it would not have had any allocations in the first ten years of the SNF acceptance under the allocations and acceptance rates in the 1991, 1992, or 1995 ACRs. See Response to Defendant's Proposed Findings of Fact ¶ 38, at 29. Further, even under the revised acceptance rates that SFI proposes, it would not have any SNF acceptance rights until 2005, at the earliest. See Pl. Reply App. 145 (in document containing rates that plaintiff believes appropriate, plaintiff's first SNF acceptance begins eight years after first program SNF acceptance). Accordingly, SFI has no basis for complaining that DOE has already acted in bad faith towards SFI.[12]

---

[11] The briefing that the Court in Commonwealth Edison considered did not include any arguments about good faith and fair dealing claims. See Commonwealth Edison, 56 Fed. Cl. at 653 n.2 & 4.

[12] SFI's citation to Solar Turbines, Inc. v. United States, 23 Cl. Ct. 142 (1991), at page 27 of its reply brief only serves to highlight the fact that, unlike the plaintiff in Solar Turbines, SFI has provided no evidence whatsoever of any specific malice or bad faith toward it by DOE.

Nothing in any of the evidence that SFI proffers demonstrates any specific intent by DOE to injure SFI, that DOE's actions were "motivated alone by malice," or that DOE's actions were part of a course of conduct that was "designedly oppressive" or "activated by animus" toward SFI. See Am-Pro, 281 F.3d at 1241. The only "evidence" is counsel's efforts to twist factual scenarios into something sinister – without any actual evidence of malicious intent. Counsel's speculation cannot form the basis of "clear and convincing evidence" of DOE's intent. Because there is no evidence that supports SFI's claim for a breach of the duty of good faith and fair dealing, that claim should be dismissed.

## III. SFI HAS FAILED TO DISTINGUISH ITS TAKINGS CLAIM FROM ITS BREACH OF CONTRACT CLAIM, AND THE TAKINGS CLAIM SHOULD, THEREFORE, BE DISMISSED

### A. SFI's Complaint About Its Real Property Is Merely A Redescription Of Its Complaint About DOE's Failure To Satisfy Its Obligations Under The Standard Contract

It is well-settled in this Court that the concept of a taking has limited application when rights have been voluntarily created by contract. Home Sav. of Am., F.S.B. v. United States, 51 Fed. Cl. 487, 494 (2002). "[I]nterference with contract rights generally gives rise to a breach claim because the parties' rights emanate from the contract, and not from a 'taking' for public use." Id. at 494 (citing Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786, 818 (1978)). "[W]hen the government is a party to a contract, . . . the contract 'gives rise to the expectation either that the contract will be performed or that the non-breaching party will have available to it

---

Similarly, its reference to section 305, comment d, of the Restatement (Second) of Contracts to support the view that "'evasion of the spirit of the bargain' can constitute bad faith," Pl. Reply 27, again eliminates the presumption of good faith upon the part of Government employees and the requirement for clear and convincing evidence of an intent to injure the plaintiff.

a contract-based remedy.'" Id. at 495 (quoting Castle v. United States, 48 Fed. Cl. 187, 218 (2000), aff'd in relevant part, rev'd in part on other grounds, 301 F.3d 1328 (Fed. Cir. 2002)).[13]

Here, the "property right" about which SFI actually complains is its "right" to have the Department of Energy begin acceptance of SNF and/or HLW by January 31, 1998. That "right," to the extent that it exists, was created by the Standard Contract. SFI does not dispute that it has a contract-based remedy for the Department of Energy's delay in beginning SNF and/or HLW acceptance. In fact, as the Court is well aware, SFI is seeking damages for that partial breach as part of this very case. However, SFI apparently argues that its current takings claim – for a taking of its "real property" – is unrelated to its Standard Contract with DOE. See Plaintiff's Reply, at 28-30, 33-34.

Yet, absent the Standard Contract, DOE would have absolutely no obligation to accept or dispose of SFI's SNF or HLW. To the contrary, absent the Standard Contract, SFI, and only SFI, would have the sole responsibility for the continued storage and disposal of its SNF and HLW. As a result, absent the Standard Contract, SFI would have to conduct exactly the same storage activities, at its own expense, that it now complains it has to conduct. That is, absent the Standard Contract, SFI would have to store its SNF upon its real property until and unless it could devise an alternative means of storage and/or disposal.

[13] Numerous recent decisions dismissing takings claims based upon rights emanating from a contract that was breached have been issued by this Court and the United States Court of Appeals for the Federal Circuit. See, e.g., LaVan v. United States, 382 F.3d 1340, 1351-52 (Fed. Cir. 2004); FDIC v. United States, 342 F.3d 1313, 1320 (Fed. Cir. 2003) (affirming Bailey v. United States, 53 Fed. Cl. 251, 256-57 (2002)); Castle, 301 F.3d at 1342; Granite Mgt. Corp. v. United States, 55 Fed. Cl. 164, 166 (2003); Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 152 (2002); Home Sav. of Am., F.S.B., 51 Fed. Cl. at 494-96; Lockheed Martin Corp. v. United States, 50 Fed. Cl. 550, 566 (2001), aff'd, 48 Fed. Appx. 752 (Fed. Cir.2002).

Apparently, SFI believes that it can take an obligation created by contract, identify a breach of that contractual obligation, and, at the same time that it seeks contract damages for a breach of that obligation, seek additional damages resulting from the same breach of that same obligation under a takings theory merely by focusing on the alleged effects, rather than the cause or basis, of the breach. Here, SFI asserts that the Government has taken its real property because, by failing to meet its contractual obligations, DOE has required SFI to continue to store SFI's SNF, which SFI has elected to do on SFI's real property. Yet, the Government has not "taken" SFI's real property. The Government has not seized SFI's land or facilities. Further, the Government has not invaded SFI's land or facilities by placing Government property upon SFI's land or in SFI's facilities. As a result, SFI is complaining that it is being required to store SFI's SNF. The only Government obligation relating to SFI's SNF arises from, and will be identified by reference to, SFI's contract with the Department of Energy. "Instead of conferring a right protected from a taking, 'the contract promised to either regulate [plaintiffs] consistently with the contract's terms, or to pay damages for breach.'" Franconia Assocs. v. United States, 61 Fed. Cl. 718, 737 (2004) (quoting Castle, 301 F.3d at 1342). SFI's efforts to distance its contract from its takings claim are wholly unpersuasive.

B. Given That SFI Still Controls And Has Sole Possession Of Its Real Property, The Government Has Not "Taken" SFI's Property Rights In Its Real Property

There are essentially two types of takings cases presented in actions under the Tucker Act. The first type is an outright Governmental seizure or occupation of private property: a physical taking. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992). Because SFI, not the Government, owns and holds title to SNF at issue in this case, SFI cannot

argue that the Government has somehow physically invaded or occupied SFI's property or has required SFI to allow third parties to trespass upon its property. To the contrary, SFI, and only SFI, is in full possession of its real property and is storing the SNF that it owns and to which it holds title. Because the Government does not hold title to the SNF, SFI has no basis for seeking damages for a physical invasion or occupancy of its property.[14]

The second type is a regulatory imposition that constrains an owner's continuing use of property: a regulatory taking. Such a taking occurs when regulations go "too far" and impinge upon private freedom. See Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). However, as previously discussed, the "right" to acceptance of SFI's SNF was not created by statute or regulation, but by a contract between DOE and SFI. Although those terms of the Standard Contract that were promulgated through notice-and-comment rulemaking in the Federal

---

[14] In its reply brief, SFI cites several cases to support its proposition that "a taking occurs where the Government forces a business to provide land and services for the benefit of the public." Pl. Reply 29. All of the cases upon which SFI relies to support this proposition involve situations in which the Government either physically occupied, and possessed, the real property at issue or required the real property owner to allow third parties physically to "invade" or trespass upon that real property. Here, SFI is the only entity in possession of SFI's property, precluding any physical invasion argument.

In addition, in its complaint, SFI does not appear to allege that DOE has required SFI to store SFI's SNF in any particular place. Although SFI has apparently elected to keep its SNF on the same real property upon which its nuclear power plant rests, SFI cannot identify any regulation or rule that DOE has issued that mandates its storage there. We acknowledge that the NRC's licensing requirements place restrictions upon any entity's ability to transport SNF to a new storage location. However, DOE has not imposed those restrictions upon SFI, and such restrictions must be expected in the highly-regulated nuclear industry. Further, several nuclear utilities are involved in the development of a private fuel storage facility, see 64 Fed. Reg. 18451 (Apr. 14, 1999), which, if approved, would allow for off-site storage. In any event, for purposes of this motion, it is unimportant whether DOE has implicitly required SFI to keep its SNF upon SFI's real property, given that any rights requiring DOE to accept and dispose of that material were created by contract.

Register should, like clauses from the Federal Acquisition Regulation, be interpreted by reference to the rules applicable to regulatory interpretation, see Honeywell, Inc. v. United States, 228 Ct. Cl. 591, 596, 661 F.2d 182, 186 (1981), that rule of interpretation does not change the character of the action here: a claim for a breach of contract affecting rights created by contract. The "regulation" that created the terms of the Standard Contract did not create any agreement between DOE and any particular nuclear utility. No "agreement" existed until such time as the nuclear utility and DOE mutually executed the Standard Contract identifying the particular nuclear power generator to which the contract would apply. As a result, it is clear that no regulatory action has "taken" SFI's real property. Instead, SFI's use of its real property to store SNF that SFI contends DOE was otherwise obligated to accept under the terms of the Standard Contract relates to SFI's contract and gives rise only to a claim for breach of contract.

C. SFI's Assertion That The Federal Circuit Has Already Permitted Spent Nuclear Fuel Plaintiffs To Pursue Contract And Takings Claims Concurrently Is Unfounded And Misleading

SFI contends that the Federal Circuit has "allowed a utility, on identical facts, to maintain both a breach of contract claim and a takings claim," citing Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Pl. Reply 31. However, SFI's interpretation of the Maine Yankee decision is inaccurate and misleading. In Maine Yankee, the Government filed a motion to dismiss the plaintiff's complaint for lack of jurisdiction, arguing that the plaintiff was required to exhaust its administrative remedies before it could proceed with either its breach of contract and takings claim in this Court. However, the Federal Circuit found that, with regard to the plaintiff's breach of contract claim, the "Avoidable Delays" and "Disputes" clauses contained in the Standard Contract did not encompass the delay at issue in

this case and that, therefore, no administrative exhaustion was required before the plaintiff could pursue its contract claim. See Maine Yankee, 225 F.3d at 1342. The Court stated that the Maine Yankee plaintiff "was not required to invoke the contract's disputes clause before bringing suit" and that its taking count "cannot be viewed as constituting avoidable delays under that clause." Id. at 1342-43.

Contrary to SFI's contention, the Federal Circuit in Maine Yankee did not make any determination that the plaintiff's takings claim stated a viable cause of action. The only motion that the Court considered was a jurisdictional motion requesting dismissal based upon the plaintiff's failure to exhaust its administrative remedies. The Federal Circuit was neither presented with nor considered arguments regarding the viability of a takings claims outside the context of the Standard Contract. SFI's suggestion that the Federal Circuit has somehow ruled favorably upon the merits of its takings claim is simply unfounded.

SFI also cites several cases from this Court to support its argument that it may assert a takings claim that clearly flows from a contractual obligation. Pl. Reply 32 & 34. As the Court is aware, in our motion to dismiss, we identified SNF cases in which takings claims substantially similar to SFI's claim were dismissed because they were "grounded on the SNF contracts that [plaintiffs] executed with the United States." Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (unpublished); see Commonwealth Edison, 56 Fed. Cl. at 656. In response, SFI cites to this Court's unpublished decision in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl. June 26, 2003), which allowed the plaintiff to proceed with its takings claim through trial, as evidence that it can recover upon both a breach of contract claim and takings claim as a result of DOE's delay. However, in Yankee, a case over

which Senior Judge Merow is presiding, the only reason that the Court identified for allowing the takings claim to proceed was the Court's concern that the plaintiff's allegations about the Government's failure to dispose of Greater-Than-Class-C radioactive waste ("GTCC waste") under the Low Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPAA"), 42 U.S.C. §§ 2041b-2041i, might somehow create a taking. Yankee Atomic Elec. Co. v. United States, No. 98-126C, slip op. at 5 (Fed. Cl. June 26, 2003) (if GTCC waste is not covered by the Standard Contract, "a continued presence of GTCC on plaintiff's site despite defendant's statutory obligation" under the LLRWPAA "to dispose [o]f it could, conceivably, form the basis for a taking claim").[15] Here, SFI has made no allegations about GTCC waste or complained about DOE's alleged failure to remove GTCC waste, precluding its reliance upon the rationale of the Yankee decision. In fact, in another SNF case over which Senior Judge Merow is also presiding, the Court dismissed the plaintiff's takings claim in its entirety where the plaintiff had made no allegations regarding GTCC waste. Southern Nuclear, No. 98-614C, slip op. at 5.

---

[15] With all due respect, the Court's suggestion that a takings claim could exist based upon DOE's failure to act in accordance with a statute is incorrect. No entity has a property right in a rule of law, as "the law itself, as a rule of conduct, may be changed at the will or even the whim, of the legislature, unless prevented by constitutional limitations." Fern v. United States, 908 F.2d 955, 959 (Fed. Cir. 1990) (quoting Munn v. Illinois, 94 U.S. 113 (1876)); see Branch v. United States, 69 F.3d 1571, 1577-78 (Fed. Cir. 1995) ("if every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever'") (quoting L. Fuller, The Morality of Law 60 (1964)); Pittman v. Chicago Bd. of Educ., 64 F.3d 1098, 1104 (7th Cir. 1995) ("A statute is not a commitment by the legislature never to repeal the statute. . . . Statutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred"), cert. denied, 517 U.S. 1243 (1996). "Because Congress has the right to modify or terminate a federal program, the benefits of such a program do not constitute a property interest protected by the Fifth Amendment." Members of the Peanut Quota Holders Ass'n, Inc. v. United States, 60 Fed. Cl. 524, 529 (2004). Nevertheless, because SFI is not basing its takings claim upon the alleged failure to dispose GTCC waste, Senior Judge Merow's concerns in Yankee are irrelevant to the takings claim in this action.

SFI also cites to this Court's decision denying a motion to dismiss one of the SNF plaintiff's takings claims in Sacramento Municipal Utility District v. United States, 61 Fed. Cl. 438 (2004) ("SMUD"), where the Court stated that "where the Government has forced storage on another's private property the Just Compensation Clause is implicated." Id. at 442. With all due respect, we disagree with the Court's decision to the extent that it applies to rights created by a contract with the Government. The fact that the plaintiff's rights to removal of SNF by a date certain were created solely by contract requires that any damages claim focus upon the contract, not upon recovery for a Fifth Amendment taking. Indeed, the Court implicitly acknowledged this principle by deciding to bifurcate the breach of contract and takings trials and concluding that a takings trial would only be conducted if SMUD lost on its breach of contract claim. Further, the Court's decision to deny the Government's motion to dismiss appears based in large part upon the belief that takings claims are necessarily fact specific, this Court has not hesitated to dismiss takings claims that fail to state a claim. See, e.g., Granite Mgt., 55 Fed. Cl. at 166; Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 152 (2002); Home Sav., 51 Fed. Cl. at 494-96. This Court should not disrupt the well-settled Federal Circuit precedent which clearly provides that, if an obligation is created by a contract with the Government, the proper remedy for the Government's breach of that right is through a breach claim, not a taking.[16]

---

[16] SFI also cites to this Court's decision to reserve judgment upon whether the plaintiff could state a claim for a taking under the Standard Contract in Detroit Edison Company v. United States, 56 Fed. Cl. 299 (2003). As we discussed in our motion, although we respectfully disagree with the decision in Detroit Edison, even the reasoning in that case does not prevent the Government from prevailing upon its motion in this case. In Detroit Edison, the Court chose not to dismiss the takings claim at that "point in the litigation" because a "more fully developed record" would allow it to assess whether the property right implicated was outside of the rights granted under the Standard Contract. Id. at 302-03. Here, there is no doubt that any right that SFI has to require DOE to accept its SNF was created through its contract with DOE.

D. SFI's Argument That It Could Recover Additional Types Of Damages Under A Takings Theory That Would Otherwise Not Be Recoverable Under A Breach Of Contract Theory Provides No Basis For A Takings Claim

SFI argues that it must be permitted to pursue a takings claim as an alternative to its contract claim because it "potentially could recover consequential damages on its takings claims, which damages are generally unavailable as a remedy for a breach of contract"[17] and might also recover "prejudgment interest" under its takings claim. Pl. Reply 35-36. Even if true, SFI's argument does not somehow create a viable takings claim. Because SFI has available to it a right to pursue its contract-based claims against the Government and to recover those damages that are available for a breach of contract, SFI's "expectations with regard to [its] property interests have not been contravened," Castle, 48 Fed. Cl. at 218, and SFI's claim is "conceptually foreclosed." Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 187 n.9 (1997), aff'd sub nom, Ariadne Fin. Serv. Pty, Ltd. v. United States, 133 F.3d 874 (Fed. Cir.), cert. denied, 525 U.S. 823 (1998).

SFI apparently contends that its contract-based takings claim survives to the extent a takings award might exceed SFI's recovery pursuant to its contract remedies, regardless of whether the parties' expected recovery was limited to these remedies at the time of the alleged contracting. Pl. Reply 35-36. However, this Court has correctly rejected this very contention:

> [T]he lack of a "complete" contract remedy, either because it would not include interest or because the contract theory does not yield a recovery, does not give life to a takings theory. If the

[17] Contrary to SFI's assertion, consequential damages are not available in a takings action. National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 405 F.2d 1256, 1273 (1969) ("Government is not liable under Fifth Amendment for consequential damages arising from carrying on of its lawful activities.")

> contract remedy does not produce a recovery, it is because the contract did not give a right to a recovery. In the absence of that contract remedy, no other property right is implicated.

Home Sav. of Am., 51 Fed. Cl. at 495-96, quoted with approval in Bailey, 53 Fed. Cl. at 256; see Granite Mgt. Corp, 55 Fed. Cl. at 166 (rejecting plaintiff's assertion that, because "prejudgment interest is not available as a contractual remedy[,] it will not receive just compensation," and holding that the Court "is unwilling to open such a loophole"); Castle, 48 Fed. Cl. at 219-20. SFI raises precisely the same contentions concerning prejudgment interest and "additional damages" that were rejected in Castle and Home Savings.

E. The Cases That SFI Cites To Support Its Ability To Recover Under Both Contract And Takings Theories Do Not Support Its Argument

SFI argues that "a takings claim is appropriate where 'the government ha[s] taken away the range of remedies associated with the vindication of a contract.'" Pl. Reply 34 (quoting Castle, 48 Fed. Cl. at 219). We do not disagree with that quotation of the relevant law. However, SFI's only allegation that it will not be permitted to pursue the full range of remedies that its contract provides – an allegation that is not included in its complaint – is that, "[o]ver the last several years, the Government has asserted numerous rationales for excusing its failure to perform its obligations under the Standard Contract and has systematically attempted to either eliminate or restrict Plaintiff's full range of remedies." Pl. Reply 34.

To the extent that SFI is relying upon unidentified positions that the Department of Energy has taken outside the context of litigation to support a takings claim, SFI's reply brief itself establishes that various appellate courts have rejected those Department of Energy positions to which SFI is now referring. See Pl. Reply 34-35 (citing the Northern States, Indiana

Michigan, and Alabama Power decisions and asserting that, in each case, the court "reject[ed]" the Department of Energy's position). In fact, SFI's reply brief establishes that, in fact, SFI has had ample protection from the courts in defending against those "positions" by the Department of Energy that it does not like. Clearly, its "range of remedies" has not been abrogated, precluding any basis for a takings claim.

Alternatively, SFI claims that the Government has somehow imposed “another damages-limiting initiative . . . . [by attempting] in other spent nuclear fuel cases to impose an SNF acceptance rate schedule upon the court and parties that contradicts virtually every system design or other document published by DOE during the last twenty years." Pl. Reply 35. Yet, SFI cannot argue, and has not argued, that the Government's litigation positions somehow eliminate SFI's full range of contract remedies. The Government has attempted in other litigation to define the meaning of the terms of the Standard Contract. This Court will evaluate those definitions and determine whether they are correct. If the Court determines that the Government's position is correct, it means that the Standard Contract did not provide SFI with the scope of contract "rights" that it presently asserts. If the Court determines that the Government's position is not correct, the Court will presumably reject the Government's position and determine the appropriate meaning of SFI's contract. Either way, SFI has no basis for arguing that the Government's positions somehow "limit" SFI's range of contractual remedies. If the contract did not provide SFI with the rights that it now claims, SFI has no basis for seeking damages for a breach of those non-existent rights, and the Court will determine the validity of each party's positions.

SFI also cites to this Court's decision in Integrated Logistics Support Systems Int'l, Inc. v. United States, 42 Fed. Cl. 30 (1998), to support its ability to recover both for a breach of the Standard Contract and for a taking of its real property. Pl. Reply 33. In Integrated Logistics, although the plaintiff alleged a breach of an express contract by the Government, the plaintiff also alleged claims that the Government had breached an unwritten implied-in-fact contract that was "entirely unrelated" to the express contract and, "in the alternative, a compensable taking of its [personal] property." Integrated Logistics, 42 Fed. Cl. at 33, 36. The Court found that, because it could not "conclude that the contract conferred expressly upon defendant rights of possession, use, ownership, and alienation in the materials" that the Government allegedly took from the plaintiff, "and because plaintiff has alleged facts sufficient to support the converse," the plaintiff had alleged a potentially viable takings claim. The Court's denial of the Government's motion to dismiss was premised upon the plaintiff's factual allegations that the express contract did not relate to the materials of which the Government had taken physical possession.

Here, however, the Standard Contract plainly encompasses the parties' rights and obligations relating to SFI's SNF and HLW. Although SFI asserts that its real property interests relating to the land upon which "its nuclear power plants stand" are separate from its contract, see Pl. Reply 12-13, absent the Standard Contract, SFI, not the Federal Government, would be solely responsible for the storage and disposition of SFI's SNF and HLW. Further, the Government has not taken physical possession of SFI's real property. Instead, SFI remains in possession and control of its real property. In addition, absent the Standard Contract, SFI cannot identify any physical invasion or seizure of its real property by the Government, which, absent a contract, might entitle it to compensation under the Fifth Amendment. Accordingly, this Court's decision

in Integrated Logistics provides no support to SFI. Instead, SFI complains about the alleged effects of the Government's partial breach of the Standard Contract. See A&S Council Oil Co. v. Lader, 56 F.3d 234, 241 (D.C. Cir. 1995)

SFI also attempts, with no success, to distinguish the Allegre Villa case from the facts and issues here. However, as we stated in our response, the Allegre Villa holding and rationale are directly applicable here. Here, SFI entered into the Standard Contract with the Government, and, like the plaintiffs in Allegre Villa, is in privity with the Government. In contrast, the plaintiffs' contracts in Cinega Gardens and Chancellor Manor were with third parties, not with the Government, precluding any basis for a breach of contract claims against the Government. Allegre Villa v. United States, 60 Fed. Cl. 11, 19 (2004). SFI should not be allowed to state both a breach of contract claim and a takings claim that are both clearly based on the terms and conditions of the Standard Contract.

## IV. DEFENDANT'S REQUEST FOR LIMITED DISCOVERY ON LIABILITY ISSUES IS APPROPRIATE UNDER THESE CIRCUMSTANCES

The Government requested limited discovery in the event that the Court is considering granting plaintiff's motion for summary judgment regarding liability. SFI opposes that request, asserting that the Court need not look beyond its pleadings to decide its motion for summary judgment on liability. Pl. Reply 39. However, the SFI motion raises issues that have not been addressed by this Court previously -- specifically, whether a contract holder that did not have any allocations of SNF in the first ten years of the operation of the repository has a breach of contract claim, including whether an injury has been suffered sufficient to assert the claim at this time.

Summary judgment should not be granted when one party has yet to be afforded its opportunities for pretrial discovery. A party cannot be deprived of the discovery needed to place at issue material factual questions in opposition to a motion for summary judgment. When discovery is reasonably directed to facts essential to justify the party's opposition, such discovery must be permitted or summary judgment refused. RCFC 56(f), which mirrors Rule 56(f) of the Federal Rules of Civil Procedure, provides as follows:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify such party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The normal summary judgment requirement – that a nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" – is "qualified by [RCFC 56(f)'s] provision that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to its opposition." Opryland USA, Inc. v. The Great Am. Music Show, Inc., 970 F.2d 847, 852 (Fed. Cir. 1992) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 250 n.5 (1986)). Accordingly, summary judgment should not be granted when one party has yet to exercise its opportunities for pretrial discovery. National Life Insurance Co. v. Solomon, 529 F.2d 59, 60 (2d Cir. 1975). RCFC 56(f) motions, therefore, are liberally granted. Gregory Lumber Co. v. United States, 9 Cl. Ct. 503, 532 (1986) (embracing with approval a liberal construction of Rule 56(f)).

As we explained in our motion, virtually no discovery has been taken from SFI. Our discovery here will include inquiries into (1) SFI's historical understanding of the purpose of the

delivery commitment schedules and its understanding of the meaning of the Standard Contract's acceptance schedule provisions, both at the time of contract formation and subsequently; (2) the bases upon which SFI's understanding of the contract provisions rests; and (3) the actual reasons that SFI declined to submit delivery commitment schedules to DOE. Def. Reply App. 43-44. Limited discovery may be appropriate here, where material facts are needed by the Government to fully oppose SFI's motion for summary judgment regarding liability.

## CONCLUSION

For the foregoing reasons, the Court should grant our motion for summary judgment upon Counts I and II of plaintiff's complaint and our motion to dismiss Count III of plaintiff's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

October 29, 2004

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on October 29, 2004, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND MOTION TO DISMISS COUNT III OF PLAINTIFF'S COMPLAINT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.