ACR, yes, that is correct.

Q. So there's more capacity to allocate?

A. The acceptance rates and, hence, the capacity is larger in the 2000 ACR than it was in the earlier one, yes.

Q. Does that mean there's more capacity to allocate now?

A. Yes, I would say so.

Q. So that's consistent with your one possible use of that sentence, maybe there will be more capacity to allocate later, we have more capacity to allocate later in the 2004 ACR, right?

A. The capacity allocation is larger in the 2000 ACR, yes, that's true.

Q. Now, also just very briefly, on the question of shutdown priority, you do agree that it's always possible that DOE may grant priority in the future, right?

A. DOE does allow DOE to grant shutdown priority to reactors, yes, that is true.

Q. You agree that it's always possible that DOE may grant that in the future, right?

A. Yes.

Q. And you also mentioned in your deposition, I just want to make sure this is true, that Homeland

Page 4072

A. Yes, this document was produced prior to the Nuclear Waste Policy Act being enacted.

Q. Could I direct your attention to page eight of this document? On page eight, there seems to be a list there of several different facilities and proposed opening dates. Do you have an understanding as to how many facilities were envisioned when this document was prepared?

A. Yes, it appears this document is envisioning six different facilities.

Q. And could I ask you to turn to the next page, page nine, and I believe Mr. Stouck read footnote C into the record. Based on what's depicted there on that chart, do you have an understanding as to what this document envisioned as to the number of facilities and the acceptance rate of each of those facilities?

A. Yes, I do. It appears that there are six facilities, and it lays out the acceptance rate by facility in table 2 on page nine.

Q. Mr. Pollog, could I direct your attention to Plaintiffs' Exhibit 54, which is the 1988 annual capacity report?

A. Yes.

Q. Do you have that in front of you?

Page 4073

A. Yes, I do.

Q. Could I ask you to turn to page five, please?

A. Yes, I'm at page five.

Q. Mr. Pollog, do you have an understanding, based on the section in this document that Mr. Stouck asked you to read, what this document assumed in terms of start date for the MRS and the repository?

A. Yes, it appears that both the MRS and repository will be starting in 2003.

Q. And do you have an understanding as to whether the 10,000 MTU limitation would apply to an MRS facility if the repository were operating?

A. The 10,000 metric ton uranium limitation would no longer apply.

Q. Mr. Pollog, could I direct your attention to Defendant's Exhibit 24, which is the 1991 annual capacity report, page four of that document? And could you highlight the middle paragraph on that page? And, Mr. Pollog, could you read that paragraph, please?

A. Yes. "The acceptance rates in table 2.1 do *not reflect the MRS facility schedule linkages with* the repository development that were imposed by the NWPA, *but are consistent* with the 10,000 metric ton

Page 4074

storage capacity limit contained in the NWPA for an *MRS facility before a repository starts operation.* These acceptance rates assume commencement of *facility operations in 1998.* If the current linkages between MRS *facility construction and repository construction* authorization are maintained, it is estimated that *commencement of facility operations and initial* acceptance of SNF by DOE could not start until at least 2007."

Q. Mr. Pollog, does the paragraph you've just *read capture your understanding as to the basis for* the rates set forth in the 1991 ACR?

A. Yes, it does.

THE COURT: I should note for the record that AFR means away from reactor.

MS. SULLIVAN: I appreciate that.

BY MS. SULLIVAN:

Q. Do you know, with that clarification from the Court, do you know what that means?

A. I believe, away from reactor, yes, I do think I know what that means.

Q. What is an AFR facility?

A. Well, I think it's a storage facility that's not located at the reactor site.

Page 4075

Q. Is that a term that's been used by DOE since you've been with the program?

A. Not to my knowledge, no.

Q. Mr. Pollog, just to clear up a question that I believe His Honor asked you, is your view as to the binding nature of DCSes tied to the existence of a specific facility?

A. No, it is not. It's not.

Q. But the rates in the ACR upon which the DCSes are to be based, is it your understanding that these rates are dependent upon a facility?

A. Yes, they were developed with a facility in the system in mind.

Q. Are the rates in the 1991 ACR and the 2004 ACR different?

A. Yes, they are.

Q. Why?

A. The 1991 ACR was based upon having a MRS in the system in the Waste Management System. The 2004 ACR assumes there will be no MRS in the Waste Management System.

Q. And that has an effect on the rates?

A. Yes, it does. The 2004 would assume that the spent fuel was being transported from the reactor right to the repository.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.,
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday, August 5, 2004
Volume 18

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - - -

MS. SULLIVAN: Good morning, Your Honor. We're ready to call our next witness unless there's anything we need to handle preliminarily.
THE COURT: Okay.
MS. SULLIVAN: The government calls David Zabransky.
Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:
Q Good morning, Mr. Zabransky. Are you currently employed at the Department of Energy?
A Yes, I am.
Q And to what office within the Department of Energy are you currently assigned?
A I'm in the Office of Civilian Radioactive Waste Management, and I work in the Office of Systems Analysis and Strategy Development within that office.
Q. What are your current responsibilities?
A. I report to Chris Kouts, and I work on issues related to the standard contract, other

Page 4143

So we'd have to make sure that we just didn't take from one utility to advance to another one, and then wind up not being able to serve that utility that had already been in line.

Q. Mr. Zabransky, does the Office of Civilian Radioactive Waste Management try to manage the waste management program in an efficient and cost-effective manner?

A. I think, as federal employees, we always try to do our jobs in an efficient, cost-effective manner. It's a goal of the program to operate in an efficient, cost-effective manner, and I think we do things to try to ensure that happens.

Q. What types of things does RW do to try to manage the program in an efficient and cost-effective manner?

A. Typical things like procurements are done in a competitive fashion, to invest value for government whenever possible. And when we look at planning the system, we try to plan a system that meets the needs we have to take into account from our utility customers, but to be reasonable in doing it, so we don't overbuild systems that don't get utilized.

Q. Does this goal of being efficient and

Page 4144

cost-effective translate into a specific acceptance rate?

A. No, it doesn't, that I know of.

Q. Do you understand the term "full cost recovery" as that term is applied to the waste management system?

A. Yes, I do.

Q. What does that term mean to you?

A. Well, to me, that term means that the users of the system, those who we have contracts with, pay the full cost of us developing and operating the system, which includes developing the transportation equipment, the facility, Yucca Mountain, and ultimately closing that facility in the future, and those costs are all borne by the users.

MS. SULLIVAN: One moment, Your Honor. Nothing further at this time, Your Honor. I would move for admission of Plaintiffs' Exhibit 81, which was the letter that Mr. Zabransky sent to Alan Brownstein.

THE WITNESS: Your Honor, if I could take just a two-minute break?

MS. SULLIVAN: Hang on just a minute.

THE WITNESS: Sorry.

MS. SULLIVAN: Let's do this.

Page 4145

MR. SHAPIRO: Your Honor, we don't have any objection to the admission of Plaintiffs' Exhibit 81, although we would want to check to make sure that there aren't any additional documents that should appropriately be considered along with this one in order to have a complete record of this, but as far as this document goes, we don't have any objection.

THE COURT: Plaintiffs' Exhibit 81 is admitted.

(Plaintiffs' Exhibit Number PX-81 was received in evidence.)

MS. SULLIVAN: Thank you, Your Honor.

THE COURT: Why don't we take a break, 10 minutes?

MS. SULLIVAN: That's fine.

(Whereupon, a short recess was taken.)

MR. SHAPIRO: Good morning, Your Honor.

CROSS-EXAMINATION

BY MR. SHAPIRO:

Q. Good morning, Mr. Zabransky.

A. Good morning.

Q. I'd like to start with some questions about the delivery commitment schedule process. I believe you testified that starting in the 1997 time frame, the Department of Energy stopped approving or

Page 4146

disapproving delivery commitment schedules proposed by utilities?

A. Yes, and I think it was in early '97, we stopped processing the submittals from utilities.

Q. And DOE also stopped processing approvals or disapprovals of submittals of final delivery schedules from utilities?

A. We never processed any, so we never started those.

Q. And instead, DOE sent letters to utilities responding to those proposed final delivery commitment -- final delivery schedules stating they were being neither approved nor disapproved, isn't that correct?

A. I believe that's correct, yes.

Q. But the contract doesn't contain language that provides DOE that option to be either approving or disapproving, isn't that correct?

A. That's correct.

Q. And it was your opinion at the time, as contracting officer's technical representative, that the contracting provide that option, correct?

A. I was a technical representative. I didn't make contract interpretations as to what it provided or didn't provide with respect to provisions, but,

Page 4147

no, I didn't think it provided that provision at that time.

Q. And the reason that the Department took the position of neither approving nor disapproving delivery commitment schedules or final delivery schedules is because the Department's lawyers advised OCRWM to take no action?

A. No, the Department's lawyers advised the contracting officer.

Q. And that was done on the advice of counsel?

A. Yes, but they advised the contracting officer, not OCRWM.

Q. But ultimately, it was the lawyers that caused that to happen, counsel?

A. Counsel's advice to the contracting officer was that they no longer approve DCSes, so, yes, I would say.

Q. And because of the advice that the contracting officer, DOE, received from the lawyers, at this point, the Department has not reviewed delivery commitment schedules since early 1997, since then, has it?

A. It hasn't reviewed any since then for allocations that were predicated upon the '98 acceptance date, no.

Page 4148

Q. And since the Department has stopped reviewing delivery commitment schedules, there's been no way for a utility to get a delivery commitment schedule approved, at least not until the Department has issued its July 2004 annual capacity report last week, isn't that correct?

A. That's correct.

Q. And it is the Department's position that utilities must submit delivery commitment schedules based on the most recent annual capacity report?

A. And I guess – the Department's position is that, yes, the DCSes should be based upon the most recent annual capacity report for the period of time that's covered, yes.

Q. I believe you said in your direct examination, Mr. Zabransky, that when you were at WEPCO and also when you were the contracting officer's technical representative, it was your understanding that delivery commitment schedules, that utilities could only place on those the amount of fuel that they, for which they had an allocation in that most current ACR. Was that your testimony?

A. I think I said that, yes.

Q. But there's nothing in the standard contract itself that limits the amount of fuel that a

Page 4149

utility can put on a proposed delivery commitment schedule. That limitation just was imposed by the contracting officer in the latter one, wasn't it?

A. Well, the contracting officer provided guidance as to how to interpret and complete the DCS scheduling process. Was it unilateral, yes, they sent a letter out saying. Here's how it should be done. When I was at Wisconsin Electric, we did it that way, and I think most utilities did it that way. I don't think anybody protested the fact that it shouldn't be done that way.

Q. And there's nothing in the contract that provides that interpretation that comes from the contracting officer?

A. But it's the contracting officer's job to interpret the contract for administration purposes.

Q. I'm not sure that you answered, before I move on, I'm not sure you answered my last question. Mr. Zabransky, you're the current contracting officer, correct?

A. Yes, I am.

Q. Is there something in the contract that provides that utilities can only list on delivery commitment schedules the amount of fuel set forth in an ACR allocation?

Page 4150

MS. SULLIVAN: Objection, asked and answered. I believe he did answer that question.

THE WITNESS: I've answered that and said no.

BY MR. SHAPIRO:

Q. Now, we discussed just a moment ago, Mr. Zabransky, that the Department has stopped approving final delivery commitment schedules. The Department did receive some proposed final delivery commitment schedules, isn't that correct?

MS. SULLIVAN: Objection, mischaracterizes the witness' testimony.

THE WITNESS: I think I said the Department has never processed or approved any FDSes, and, yes, utilities sent some in for deliveries in 1998, 1999, I believe.

BY MR. SHAPIRO:

Q. And the decision to stop approving delivery commitment schedules and never to start processing final delivery commitment schedules, that was based on a belief by DOE that approving those delivery commitment schedules would commit the Department to an obligation, and the Department didn't want to do that?

A. I believe that the Department, the basis

Page 4151

for the decision to stop processing was based upon a belief that the DCSes were binding commitments, and we should not enter into binding commitments that we know we couldn't meet at that point in time.

Q. And in fact, not only did the Department stop approving those delivery commitment schedules and not even start processing final delivery schedules because of its desire not to commit itself, but on the advice of counsel, you actually went back and voided some previously approved delivery commitment schedules, isn't that correct?

A. There were a number of documents that were in the process of being approved, but had never been transmitted to the utilities. So these were documents that because, again, all correspondence goes through a review and legal review, was part of that review, that were in the system to be processed, that I had signed off on and sent on to the contracting officer, and that the contracting officer, in some cases, had signed off on, but had never been transmitted.

And prior to the final transmittal to the utilities, the review was, it was concluded that those should not be processed, and they were voided.

Q. But nevertheless, if I understand what

Page 4152

you've just said correctly, there were indeed some delivery commitment schedules submitted by utilities that reached not only your approval as contracting officer's technical representative, but the final sign-off by the contracting officer, and yours might have been the final sign-off in some occasions, yet nevertheless, those final approvals were voided?

A. Well, again, my approval as COTR would have just merely advised the contracting officer the form was ready for her to approve, so it wouldn't have been final in any case if I had signed off on it.

There were a few that Beth Tomasoni, I believe was the CO at the time, signed off on, that prior to transmittal, she rescinded.

Q. And you would not have taken the action to void those except under the direction of counsel, correct?

A. Counsel provided us advice that it would no longer be appropriate to keep signing those documents, yes.

Q. And that's why you voided those?

A. Yes.

Q. And although counsel instructed you to void your signature on some of those approved delivery commitment schedules, isn't it correct that you would

Page 4153

not presume that once you had received an approved document, that it could be voided unilaterally by the Department, isn't that correct?

MS. SULLIVAN: Objection, mischaracterizes the witness' previous testimony.

THE COURT: When you say, when the utility had received it or?

BY MR. SHAPIRO:

Q. No, I'm talking about simply, once the Department, once Mr. Zabransky and the contracting officer have approved it, that Mr. Zabransky's belief that, is that, but for the advice of counsel, that the Department was not free simply to void those unilaterally?

A. But, again, the Department never communicated its approval. The documents never left the Department. They were, the ones that the CO voided were voided before they were ever transmitted. The approval never really took place from that perspective.

Q. But you would not presume once you had received an approved document that it could be voided unilaterally?

THE COURT: I don't get the "received an approved document."

Page 4154

THE WITNESS: I'm not sure who's receiving what in your question.

THE COURT: What do you mean by "received an approved document"?

BY MR. SHAPIRO:

Q. If you get back from the contracting officer an approved document, an approved delivery commitment schedule, you wouldn't think that you could simply void that, would you?

A. I didn't void her signature. She voided her signature.

Q. Didn't you void some delivery commitment schedules yourself, some approved delivery commitment schedules yourself?

A. I only voided my signature, to my knowledge.

Q. And did your signature appear on the approved delivery commitment schedule?

A. Yes.

Q. And you voided that?

A. The contracting officer decided not to transmit and execute the final approved DCS, and we voided them, yes.

Q. And you voided your own signature as well?

A. I did, yes.

Page 4155

THE COURT: Does any of this relate to a delivery commitment schedule binding the Plaintiffs, or is this –

MR. SHAPIRO: No, it goes, Your Honor, to Mr. Zabransky's testimony that he thinks that the delivery commitment schedules have some significance, that they were binding, he thought, when they were at WEPCO, and they're important at DOE. But it would seem that the Department also feels that they can void them at the Department's whim, and that they're otherwise subject to counsel's direction to the Department not to grant them at all. That's the line of questioning.

THE COURT: I just wanted to make sure you weren't talking about Yankee Atomic or Connecticut Yankee or Maine Yankee DCS.

MR. SHAPIRO: I don't believe any of those were voided.

THE WITNESS: And, again, I think you mischaracterized what I said. The Department didn't void any DCSes that were approved and sent out and received by utilities. It recognized that once they received them, they were approved, and they had those approved DCSes. It ceased sending them out. It ceased the approval process in

Page 4156

mid-process. Transmittal letters transmitting them to the utilities were never signed, and they were never sent out by the contracting officer.

BY MR. SHAPIRO:

Q. Now, approved delivery commitment schedules are of limited value, aren't they? For example, despite having approved delivery commitment schedules when you were at WEPCO, you didn't rely on those approved delivery commitment schedules as a solution for WEPCO's near term fuel storage needs, did you?

A. When I was at WEPCO and we were contemplating needing additional storage in the '92 time frame when those schedules came up, I think it was our belief that there was some uncertainty as to whether the Department would actually come forth and perform in 1998. And as a result, we built into our thinking for storage at Point Beach, that we needed to have reliance to keep the plan operating on our own ability to store the spent fuel. And that the commitments that we have from the Department of Energy, we were glad we happened to sign them, because we thought there might be some recourse someday, but we weren't going to rely on them to put the plant in jeopardy.

Page 4157

So, again, we relied on them in the effect they were a contractual commitment, but we also made sure we had the capability to maintain the plant in operation in case the Department didn't follow through or wasn't able to follow through on that commitment.

Q. So the answer to my question is, yes, WEPCO did not rely on its approved delivery commitment schedules to provide for its, a solution for its near term spent fuel storage needs?

A. And I think that sort of mischaracterized what I said, is we went and got off as soon as we could as many commitments as we could, in case they would, for some reason, stop processing them, so we had some recourse, pursuant to the contract. But, yes, we also built facilities that made sure that, in case something happened, we weren't putting our facilities in jeopardy.

Q. Well, the reason I'm asking the question more than once is I'm not sure you're answering my question. You're concerned about putting in a caveat that I don't understand, Mr. Zabransky. So the bottom line is that, notwithstanding the fact that WEPCO had approved delivery commitment schedules and maybe had some recourse down the line,

Page 4158

WEPCO didn't rely on those to provide for its near term spent fuel storage needs, correct?

A. And I think, like I said, the answer is, yes, it has no – as would anybody else with a valuable asset that needed to make it operate, continue to operate, wouldn't put it in jeopardy solely on something beyond its control.

Q. And isn't it true that when DOE approved delivery commitment schedules, that it conditioned the approvals on the existence of a repository?

A. I think there was a point in time where DOE did that. The original DCSes in the early years, and I don't know when it changed, did not contain that conditioned statement.

Q. Well, what about the ones at WEPCO?

A. Those –

Q. That was one of the reasons you didn't rely on those is because DOE conditioned those, isn't that correct?

A. I don't believe those contained any kind of conditional statement.

Q. But others did contain conditions?

A. At some point, that was the Department's policy or was advised a statement saying these were conditioned upon the existence of the facility

Page 4159

constructed under the Act, yes.
Q. Now, for the currently approved delivery commitment schedules, the ones that, before the last week's ACR and new delivery commitment schedule instructions came out, isn't it true that you don't see any good use for the information on those approved delivery commitment schedules because the Department's current plan for its waste management system uses different acceptance rates than those upon which the earlier delivery commitment schedules were based?
A. I think your statement is partially correct. It's true that our current plans in the ACR that we just put out last week are for greater acceptance rates beginning in 2010 through 2019 then in the first 10 years of the previous ACR, but it's also correct that some of the information provided by the utilities may no longer be valid, and they may have other plans for what they wish to have done beginning in 2010.
Q. So the bottom line, again, the real crux of my question is that you wouldn't see any good use for the information on the currently approved delivery commitment schedules?
A. Those supported operations beginning in

Page 4160

1998. I don't think they're valid for use supporting operations in 2010.
Q. And it's your belief that DOE has to renegotiate those delivery commitment schedules, isn't that correct?
MS. SULLIVAN: Objection, vague. Which delivery commitment schedules are we talking about?
MR. SHAPIRO: The previously approved delivery commitment schedules.
THE WITNESS: I think the disposition of those needs to be resolved. We haven't resolved in the Department how to address that yet, but the DCSes that would be coming in under the APR that we issued last week for 2010 would be for the same fuel that were covered by the DCSes that came in previously. So we'd have to resolve that with the utilities, yes.
THE COURT: Before I forget it, do you agree with Mr. Pollog that the DCSes, well, the allocation under the capacity report is strictly for an allocation of quantity and that you can, the utility can substitute any fuel, they can list any fuel?
THE WITNESS: On the DCS?
THE COURT: On the DCS.
THE WITNESS: Yeah, I believe, I agree with

Page 4161

Tom, and that was a position I held when I was at the utility and which DOE has put forth, that the age of the fuel, the allocation really gives you a place in line, a ticket. And when it comes time to proffer your DCS and actually deliver fuel, it's any fuel that meets the criteria under the contract.
THE COURT: I guess I was kind of misled. On page 15 of Defendant's Exhibit 7, which is the contract, in article, I think it was Article V – no, Article VI.
THE WITNESS: Article VI, sir?
THE COURT: Article VI, B1(a).
THE WITNESS: B(1)(a)?
THE COURT: B(1)(a), it says, "DOE would first accept from purchaser the oldest SNF and/or HLW for disposal in the view of facilities accepted otherwise provided in paragraph B, D and E."
THE WITNESS: Yes.
THE COURT: And B, D and E talk about exchanges or things like that, so I assume the contract required the utility to deliver the oldest fuel they had first.
THE WITNESS: I think this is another case where the contracting officer issued in her directions the guidance that utilities were free to

Page 4162

submit, or free to put forth any spent fuel they had that met the criteria as spent fuel under the contract and, again, explained that the allocation provision really made sense. And that it gave you a place in line, but then let you manage your fuel inventories as you saw appropriate, so that was another clarification that was also, I believe, in the instruction transmittal letters from the DCSes.
BY MR. SHAPIRO:
Q. I want to get one more concern with the delivery commitment schedules, Mr. Zabransky. Under the contract, utilities have the express right to vary the quantities of spent fuel and high-level waste that DOE would pick up by 20 percent from the amounts on those approved delivery commitment schedules at many point before issuance of the final delivery schedule, isn't that correct?
A. I believe that's correct, yes.
Q. But if everybody adjusts their allocation upward by 20 percent, so that the quantity to be accepted is more than the total acceptance rate that the Department has planned for that year, you don't know how the Department would accommodate that contract work, do you?

Page 4163

A. The Department would be obligated to. We'd have to figure out some way to either store more fuel, work nights and weekends, work 24-hour shifts, whatever it took, but the contract gives the utilities rights to do that. Once we sign the DCSes, if they adjust them, we'll have to live with them.
Q. But you don't know how the Department would manage to accommodate that, do you?
A. I just said, Mr. Shapiro, we'd work back shifts, we'd work weekends, we'd park stuff, but it's our obligation to figure that out when and if it happens.
THE COURT: Would that possibly have any impact on accepting canistered fuel? For instance, if a number of canisters resulted in, say, being 10 percent over the allocation, if you accepted canistered fuel?
THE WITNESS: I think canistered fuel, one of the issues with that is if we have to accept it and repackage it immediately, which could be the case, that could severely limit the throughput of the facilities, so that would have to be factored into that.
THE COURT: If you didn't have to reopen them and just, the total quantity might not exactly

Page 4164

match the allocation.
THE WITNESS: And that's one of the reasons I think that provision was put in there for, was that originally there was an understanding that the allocation was a very precise number to the nearest tenth of a ton, but that could result in a less than full cask, two and a half casks, which didn't make a lot of sense, and that by adjusting it plus or minus 20 percent was one way of dealing with that.
BY MR. SHAPIRO:
Q. I wanted to make sure I understood your last testimony correctly, Mr. Zabransky. So you're saying -- and let's take the current, the most recent ACR that ramps up to an acceptance rate of 3,000 MTUs per year?
A. Yes, it does.
Q. And let's say we're in one of those years with 3,000 MTUs acceptance and utilities with allocations and the allocations that are provided for under that ACR and APR and instructions that were sent along with them would equal that 3,000 MTU, wouldn't it?
A. Yes, it does.
Q. And so if all those utilities bumped up the amounts they want to deliver by 20 percent, and the

Page 4165

Department would have to handle roughly 3,600 MTUs?
A. Yes, it would.
Q. And it's your testimony that the Department would have the capability to manage to do that?
A. No, my testimony was the Department was aware of that when it issued the ACR, and we'll deal with that, that should have come to pass. It doesn't have the capabilities today, but it would have to get them.
Q. So the Department could get those capabilities?
A. I don't see any reason why it couldn't.
Q. I want to ask you just a couple of questions about annual capacity reports, just mentioned the most recent one, the one that was sent out last week, when is spent fuel presumed to start to be picked up by the Department in that annual capacity report?
A. The report issued last week supports operations beginning in 2010.
Q. Is that the date provided in the annual capacity report, or is it like the earlier one that just had a year one instead of an actual year assigned?
A. I believe that report, and I'm doing it

Page 4166

from memory, has a table that shows 400 tons of acceptance in 2010.
Q. I want to ask you a question or two about the prior ACR. That's the one that was issued in 1995.
A. Okay.
Q. Now, the rates in that annual capacity report, you can pull that out if you don't recall it, but the rates in that annual capacity report are considerably smaller than the acceptance rates in last week's July 2004 annual capacity report, isn't that true?
A. Those rates, I believe, were 400, 600 and then 900 through the balance of the 10-year period, yes, they're smaller.
Q. And isn't it true that the Department was trying to minimize its obligations to utilities by using those rates in the 1995 ACR?
A. That may have been one of the considerations that went into that. There was no plans for a repository before 2010 at that point in time, and there was no change from the prior 4, 6, 9, 9, 9 acceptance rates in the '95 ACR, yes.
Q. I'm not asking just what may have been. Is it your opinion the Department was trying to minimize

Page 4167

its obligations by putting in those rates in the 1995 ACR?

A. In my opinion, that was probably one of the things being thought about, yes.

Q. I'm still not quite getting a complete answer to my question. I think you qualified your last answer that said that was probably one of the considerations minimizing the Department's obligations. Wasn't it your opinion that the Department indeed was trying to minimize its obligations?

MS. SULLIVAN: Objection, asked and answered, argumentative.

THE WITNESS: And I think I said, yes, they were, but I'm not sure that was the only consideration for those rates.

BY MR. SHAPIRO:

Q. Now I, want to turn back to your time when you were at WEPCO and looking at ACRs in that time period. Again, we can pull one of these out, but you recall some of those annual capacity reports noted right on there that the ACR's for planning purposes only, and it's not contractually binding on either the Department or purchasers?

A. I believe they all say that, including the

Page 4168

current one.

Q. And when you were at WEPCO, you concluded from that, that WEPCO could not rely on the department to actually accept the fuel based on the ACR, isn't that correct?

A. I believe that WEPCO needed to execute DCSes and have them approved to have any commitment from the government.

Q. You couldn't rely on the ACR?

A. The ACR was the basis for the DCS, no, there's nothing to rely upon an ACR. It's a report.

Q. Now, we've talked about a couple different acceptance rates for the Department to receive spent fuel from utilities. There's the one that ramps up to 3,000 MTU and the current ACR. You believe that acceptance rate is reasonable, don't you?

A. That's the rate that's in our requirements documents, the facilities are being designed for, and that's the rate the Department has put forth as its willing to commit to in the new ACR, yes.

Q. So you believe that the acceptance rate in the 19 – in the 2004 ACR is reasonable?

A. I believe that the rate in the ACR which presumes we'll have Yucca Mountain up and running is reasonable, yes.

Page 4169

Q. And, again, turning back to your time when you were at WEPCO, much earlier on in the process, you believe that a reasonable acceptance rate would have been one that would have reflected the aggregate rate of discharges, plus some amount of work-off, isn't that correct?

A. I believe that's the case, yes.

Q. And it's your personal opinion that an appropriate rate of acceptance under the standard contract would be a rate which kept pace with discharges and removed some of the backlog, that's correct?

A. Again, to the extent that's accomplishable, I think that's an appropriate thing for the Department to commit to.

Q. And you do think that is accomplishable by the Department?

A. That's the current plans for 2010, the Department's planning to accomplish it, yes.

Q. And, again, turning back to your time at WEPCO, when you were there, it was your position and understanding that an acceptance rate that ramped up to 3,000 MTU would be such a rate that was sufficient to work off the backlog and the discharges in a reasonable time frame?

Page 4170

A. That would have been the company's desire and my desire, yes.

Q. And it was your position and WEPCO's position when you were there that the Department had to be prepared to accept spent fuel from the utilities on a schedule which would obviate the construction of deployment of additional at-reactor storage capacity after January 31, 1998?

A. I believe that's the position we communicated to the Department in response to some of their mission plans, yes.

Q. You believe that's the position that you communicated, or you're unsure?

A. I believe it is. I mean, you're asking me for something that happened 20 years ago, but I think that's we said, yes.

Q. I think we may have that document. Let's confirm.

A. Okay.

Q. Mr. Zabransky, you're being handed what is actually an excerpt from what we have been calling here Plaintiffs' Exhibit 95, which is the complete three volume set of the 1985 mission plan. And you may know or recall the third volume of that set includes, I believe, all of the comments sent in by

DOE F 1325.8 (8-89) EFG (07-90)

HOO.920107.0011

United States Government

Department of Energy

# memorandum

DATE: December 20, 1991

REPLY TO ATTN OF: RW-432

SUBJECT: ACTION: Approval for Publication of the 1991 Annual Capacity Report

TO: Director, Office of Civilian Radioactive Waste Management, RW-1

Through: Deputy Director, Office of Civilian Radioactive Waste Management, RW-2

Background:

The Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) that the Department of Energy has executed with owners or generators of civilian spent nuclear fuel and high-level radioactive provides for annual publication of the Annual Capacity Report (ACR).

The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the Acceptance Priority Ranking (APR). However, based on discussions with Contract holders and their representatives, the Department elected to continue to publish the ACR. This change in plans was conveyed to Contract holders in a May 15, 1991, letter from the Department's Contracting Officer.

Discussion:

The ACR is required to project both an annual acceptance ranking of Contract holders and the annual receiving capacity of the Federal waste management system (FWMS) for ten years following projected commencement of facility operations. The 1991 APR assigns the highest acceptance priority, on an industry-wide basis, to the owners of the oldest spent nuclear fuel (SNF). The ACR applies a waste acceptance rate to the APR, resulting in individual allocations to the Contract holders of FWMS capacity.

The 1991 ACR assumes that FWMS operations commence in 1998 and the system configuration is that authorized by the Nuclear Waste Policy Amendments Act of 1987, specifically a Monitored Retrievable Storage facility with a 10,000 MTU storage limit prior to repository operations.

The 1991 ACR differs from previously published ACRs for two reasons. First, while the information in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules (DCS) by the Contract holders. These DCSs, which will provide planning information for waste acceptance activities, may be submitted to the Department as early as January 1, 1992.



DEFENDANT'S EXHIBIT 023

EDB0011764

Second, the 1990 ACR presented lower and upper bounding annual waste acceptance rates and corresponding Contract holder allocations of capacity. Although no annual waste acceptance rate has been baselined, the 1991 ACR uses a single acceptance rate that is very similar to the lower bounding rate in the 1990 ACR. While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate, in the aggregate, the need for additional at-reactor, out-of-pool storage starting in 1998.

As in previous years, the 1991 ACR includes an update on the progress of the cooperative interactions between the Department and Contract holders to address issues of mutual concern arising from implementation of the Contract. The ACR is distributed to Contract holders, nuclear industry trade associations and other interested parties. Response to previous ACRs has been generally favorable, although some Contract holders have expressed concern about slippages in the waste acceptance schedule beyond 1998. Consistent with past ACRs, this report states that waste acceptance will begin after commencement of facility operations.

Recommendation:

That you approve the attached 1991 ACR for publication.

Ronald A. Milner
Ronald A. Milner
Associate Director for
Storage and Transportation

Attachment

APPROVED: John N. Bartlett

DISAPPROVED: ____________

DATE: 27 Dec 1991

DOE F 1325.8 (8-89)

7 ? ? ? 7 ? ? ? | HQO.910104.0085

United States Government Department of Energy

# memorandum

DATE: DEC 2 1 1990

REPLY TO ATTN OF: RW-422

SUBJECT: ACTION: Approval for Publication of the 1990 Annual Capacity Report

TO: Director, Office of Civilian Radioactive Waste Management, RW-1

Deputy Director, Office of Civilian Radioactive Waste Management, RW-2

Background:

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR 961) that the Department of Energy has executed with owners or generators of civilian spent nuclear fuel and high-level radioactive waste requires annual publication of the Annual Capacity Report (ACR).

Discussion:

The ACR is required to project both the annual receiving capacity of the waste management system and an annual acceptance ranking of Contract holders for 10 years following projected commencement of facility operations. The information in the ACR is for planning purposes only, and is scheduled to be replaced, as required by the Contract, by a contractually binding Annual Acceptance Priority Ranking Report on April 1, 1991. The first two ACRs were published in June 1987 and June 1988, respectively. In April 1990, the Department informed all Contract holders that the 1989 ACR would not be published prior to the development of revised waste acceptance schedules based on the Secretary's reassessment of the program to Congress.

Since the waste acceptance schedule has not yet been approved and this is the last opportunity according to the terms of the Contract for an ACR to be issued, upper and lower bounding waste acceptance rates were used to provide the required information. Both cases assume availability of an Monitored Retrievable Storage (MRS) facility for spent fuel receipt in 1998. The lower bounding case was based on the system configuration authorized by the Nuclear Waste Policy Amendments Act of 1987, which includes an MRS facility with the 10,000 MTU storage limit prior to repository operations. The upper bounding case is the same waste acceptance schedule used in the last ACR and would require early MRS siting and modifications to the storage capacity limits specified in the Amendments Act.

DB0001517

DEFENDANT'S EXHIBIT 130

PENGAD-Bayonne, N.J.



EDB-001-1518

EDB0011518

HQO.19990112.0001 QA: L

DOE/RW-0406

Office of Civilian Radioactive Waste Management

# Civilian Radioactive Waste Management System Requirements Document

## Revision 05

(A00000000-00811-1708-00003)

January 1999

U. S. Department of Energy
Office of Civilian Radioactive Waste Management

HQO.19990112.0001.0001



PLAINTIFF'S EXHIBIT
P0254
Yankee Atomic Elec. Co. et al

Table 3. CISF Receipt Rates[7] (In MTHM or Equivalent/Year)

| Phase | Year of Operation | Commercial SNF[8] | Government Managed Nuclear Materials |
|---|---|---|---|
| I | 1 | 1200 | TBD 3 |
| I | 2 | 1200 | TBD 3 |
| II | 3 and 4 | 2000 | TBD 4 |
| II | 5 | 2700 | TBD 4 |
| II | 6 and subsequent | 3000 | TBD 4 |
| II | TBD 2 | 3000 | TBD 4 |

B. The CISF shall have a minimum storage capacity of 10,000 MTHM of SNF.

C. The CISF shall have a HLW storage capacity of (TBD 6).

D. The CISF shall be capable of preparing SNF and HLW for off-site transport.

## 3.6 INTERFACE REQUIREMENTS

This section identifies the interface requirements between CRWMS system elements. Acceptance criteria for nuclear materials are documented in the Waste Acceptance System Requirements Document (WA-SRD) (DOE/RW-0351P).

### 3.6.1 Waste Acceptance and Transportation - Government Agency Interface Requirements

Waste Acceptance and Transportation shall interface with appropriate federal, state, tribal, and local government agencies to meet legal, regulatory and operational requirements for acceptance and transportation of SNF and HLW, such as route selection, approval, scheduling and notification, emergency planning and response, and security.

[7] Receipt rates in this table are only applicable if a CISF is approved.

[8] This could include MOX SNF in Phase II.