**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on January 24, 2005)

| | | |
|---|---|---|
| **SYSTEM FUELS, INC.,** on its own behalf and as agent for ENTERGY LOUISIANA, INC.<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | ) | No. 03-2621C<br>(Judge Williams) |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR LEAVE TO SUPPLEMENT ITS REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND MOTION TO DISMISS COUNT III OF PLAINTIFF'S COMPLAINT**

Plaintiff System Fuels, Inc. ("SFI"), on its own behalf and as agent for Entergy Louisiana, Inc. respectfully submits, through the undersigned counsel, this reply in support of its motion for leave ("Motion for Leave") to supplement its September 2, 2004 Reply In Support Of Its Motion For Summary Judgment On Liability And Response In Opposition To Defendant's ("the Government") Motion For Summary Judgment Upon Counts I And II Of Plaintiff's Complaint And Motion To Dismiss Count III Of Plaintiff's Complaint ("SFI's Reply"). In the Government's response to SFI's motion for leave to supplement ("Gov't Response") the Government does not oppose SFI's motion for leave to supplement its Reply brief. Instead, the Government reiterates a number of arguments from previous briefs, but also introduces a wholly new one. Although the Court has already granted Plaintiff and Defendant leave to file their supplementation, Plaintiff responds briefly to the substantive arguments raised in the Government's Response, including its new argument regarding "alternative contracts."

## I. SFI HAS BEEN DAMAGED AND THE 1990s DCS PROCESS IS IRRELEVANT TO THIS PROCEEDING

The Government asserts that SFI has stated (1) "without any evidence" that it has been damaged by the Government's breach of the Standard Contract and (2) "with no support other than attorney assertions" that the 1990s DCS process was flawed. Gov't Response at 2. SFI respectfully disagrees with both points.[1]

First, despite the Government's assertions, SFI has no obligation to provide "evidence" of damages as a prerequisite for a liability ruling. RCFC 56(c) explicitly states, "A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." Consistent with the rule governing summary judgment proceedings, RCFC 42(c), entitled "Separate Determination of Liability," also permits this Court to render decisions on liability before adjudicating the issue of damages. See also Pi Elecs. Corp. v. United States, 54 Fed. Cl. 56, 57 n.2 (2002). In an apparent effort to overcome the clear language of these two rules, the Gov't Response (at page 7) refers to its July 28, 2004 Response which, citing Puritan Assocs. v. United States, 215 Ct. Cl. 976 (1977), argues that plaintiff must establish proof of damages before it can obtain a liability ruling. The Government's reliance upon Puritan is misplaced. Puritan, which involved the effect of the Government's failure to obtain a channel lease in connection with the construction of a postal

---

[1] SFI also takes exception to the Government's assertion that SFI had any obligation to respond to DOE's renewed DCS process, particularly if SFI did not have any allocations for 2010. Indeed, the "standard" DOE letter explicitly advised contract holders that "you are only required to submit a DCS for your 2010 waste acceptance allocations." Notably, one of SFI's sister companies – Entergy Services, Inc. ("Entergy") – responded on behalf of Entergy Nuclear Indian Point 2, LLC ("ENIP") and reserved the right "to share allocations under all of the spent fuel contracts to which Entergy Corporation and its subsidiaries are a party such that Entergy may designate any allocation under any of the contracts to any reactor facility owned by any Entergy Corporation subsidiary." See 9/29/2004 Letter from Frank Rives, Entergy Services, Inc. to David Zabransky, Contracting Officer DOE at 2 (excerpt attached hereto at Exhibit 1).

facility, was itself a bifurcated case in which trial on damages was separated from other case proceedings.

In this proceeding, SFI has described its damages with more than sufficient particularity to warrant a liability ruling in its favor. See, e.g., Complaint ¶ 21; SFI's Reply at 10. As stated in its Reply, Plaintiff's damages here include, *inter alia*, costs of "reracking the spent fuel storage pool at the Waterford 3 nuclear plant to allow the plant to accommodate spent nuclear fuel assemblies DOE would otherwise pick up." SFI's Reply at 10. Faced with similar allegations and arguments, various other members of this Court have rendered summary judgment on liability while deferring the question of damages. See, e.g., Sacramento Mun. Utility Dist. v. United States, slip op. at 16 (Fed. Cl., Jan. 19, 2005) ("SMUD") (holding the Government liable for breach of plaintiff's Standard Contract and acknowledging, "[w]hether damages, if any, were caused by the January 31, 1998 breach has not been adjudicated").[2] The SMUD Court also rejected the Government's argument (which it also makes here – Gov't Resp. at 6-7) that the DCS process set the date of the Government's breach. SMUD, slip op. at 12-14. Instead the SMUD Court followed decisions by the U.S. Court of Appeals for the Federal Circuit that the breach of the Standard Contracts occurred on January 31, 1998. Id. at 9-12. That has been SFI's consistent position in this case.

---

[2] The SMUD decision also discusses other spent nuclear fuel ("SNF") cases in which the Court has entered liability orders or decisions. SMUD, slip op. at 10 n.7 (citing Wisconsin Electric Power Co. v. United States, No. 00-697 (Fed. Cl. Oct. 8, 2004); Tenn. Valley Auth. v. United States, 60 Fed. Cl. 665, 674-75, 679 (2004); Southern Nuclear Operating Co. v. United States, No. 98-614 (Fed. Cl. Apr. 17, 2004); Indiana Mich. Power Co. v. United States, No. 98-486 (Fed. Cl. Jan. 17, 2003); Florida Power & Light Co. v. United States, No. 98-483 (Fed. Cl. Jan. 11, 2002); Commonwealth Edison Co. v. United States, No. 98-621 (Fed. Cl. Aug. 1, 2001); Northern States Power Co. v. United States, No. 98-484 (Fed. Cl. July 31, 2001)).

Second, contrary to the Government's assertion, SFI's filings in this case attacking the 1990s DCS process as flawed are not based on "attorney assertions;" they are based on case law and actions of the Department of Energy's Contracting Officer. See SFI's Reply at 12-18. In its motion for leave, SFI was merely reiterating DOE's own acknowledgement that the DCSs from the 1990s are irrelevant to the ongoing program at Yucca Mountain, and pointing out that DOE's December 2004 re-suspension of the program makes even more remote the practical significance of the DCS process from the 1990s. See Motion for Leave at 3 (citing SFI's Reply at 18 n.8). In this regard, SFI relies on DOE's own communications: "DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." Appendix to Plaintiff's Reply in Support of its Motion for Summary Judgment on Liability and Response In Opposition to Defendant's Motion for Summary Judgment Upon Counts I and II of Plaintiff's Complaint and Motion to Dismiss Count III of Plaintiff's Complaint at 133.[3] Furthermore, as reflected in Exhibit 3 to the Gov't Response, DOE now takes the position that it "will seek, prior to approving new DCSs from any Purchasers with previously approved DCSs, an agreement in writing that any new DCSs that are

[3] The Government consistently ignores real-world facts in trying to limit its liability to the utilities by use of the 1990s DCS process, which process was based on a monitored retrievable storage ("MRS") facility that DOE never built and on the assumption that Congress would change the law linking the construction and operation of the MRS facility to the construction and licensing of the repository. See SFI's Reply at 9-10; 1991 Annual Capacity Report at 4, Appendix to Defendant's Response to Plaintiff's Motion for Summary Judgment on Liability, Defendant's Motion for Summary Judgment Upon Counts I and II of Plaintiff's Complaint and Motion to Dismiss Count III of Plaintiff's Complaint ("Gov't App.") at 410 ("These acceptance rates assume commencement of [MRS] facility operations in 1998. If the current linkages [in the NWPA] between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of [MRS] facility operations and initial acceptance of SNF by DOE could not start until at least 2007."); see also 1992 ACR at 3, Gov't App. at 472; 1995 Acceptance Priority Ranking/ACR at 4, Gov't App. at 294.

approved actually replace, rather than supplement, the previously approved DCSs. That agreement will be reflected in any future DCS approvals." Thus, DOE's own words and actions effectively relegate to the scrap heap the DCS process of the 1990s.

## II. THE STANDARD CONTRACT DOES NOT CONTAIN EQUIVALENT, BARGAINED-FOR, ALTERNATE MEANS BY WHICH DOE MAY SATISFY ITS ACCEPTANCE OBLIGATIONS TO UTILITIES

In its response to SFI's motion for leave to supplement its earlier filings, the Government argues for the first time that the Standard Contract acts as an alternative contract. Gov't Response at 7-11. The Government states that, because the schedule terms of the Standard Contract allegedly "provide DOE with the option of selecting any one of numerous potential acceptance scenarios, . . . the schedule terms act as a form of 'alternative contract.'" Gov't Response at 7-8. As correctly identified by the Government, an "alternative contract" is "one in which a party promises to render some one of two or more alternative performances either one of which is mutually agreed upon as the bargained for equivalent given in exchange for the return performance by the other party." 11 A. Corbin, Corbin on Contracts, § 1079, at 394 (interim ed. 1979). The Government's alternative contract argument, however, fails for a number of reasons.

First, the Government's contention that the Standard Contract's schedule terms "provide DOE with the option of selection of any one of numerous potential acceptance scenarios" is simply false. As the Government has itself admitted, the Standard Contract does not include an acceptance rate. See Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 662 (2003) ("As plaintiff correctly points out, and defendant concedes, '[T]he Standard Contract itself does not identify any minimum or particular rate at which DOE, once it starts acceptance, must continue that [Spent Nuclear Fuel and/or High-Level Radioactive Waste] acceptance.'") (some internal quotations omitted). Accordingly, the Standard Contract also cannot include alternative

acceptance rates. The fact is that the Standard Contract does not identify any "acceptance scenarios" from which DOE allegedly can choose under its alternative contract theory.

Second, in order for the Standard Contract to constitute an alternative contract, the alternate "acceptance scenarios" must be "mutually agreed upon" as acceptable performance in exchange for the utilities' payment of billions of dollars into the Nuclear Waste Fund. Corbin on Contracts § 1079 at 394. The Government, however, has made no such showing, nor can it. In this litigation SFI argues just the opposite - that in return for the fees DOE collected pursuant to the NWPA DOE committed to take SNF from utilities at a rate that (1) would eliminate the need for utilities to provide for additional at-reactor storage after 1998 and (2) would begin to work off the backlog of SNF and/or high-level radioactive waste ("HLW") already stored by utilities on-site until 1998. See Commonwealth Edison, 56 Fed. Cl. at 667; see also Tenn. Valley Auth. v. United States, 60 Fed. Cl. 665, 674 n.10 (2004); Indiana Mich. Power Co. v. United States, 57 Fed. Cl. 88, 99 (2003), on appeal, No. 04-5122 (Fed. Cir.). In order to meet these twin objectives, the rate must exceed the annual generation rate of 2,000 metric tons uranium ("MTU") and an annual steady-state rate of 3,000 MTU is optimum. Commonwealth Edison, 56 Fed. Cl. at 667; Indiana Mich., 57 Fed. Cl. at 99. Stated another way, the Government cannot show that the utilities agreed upon an acceptance scenario that had the Government taking less than 3,000 MTU annually.

Finally, the alternative scenarios must be roughly "equivalent" as compared to the fees contributed by the utilities. Corbin on Contracts § 1079 at 394. DOE set the fees charged utilities under the Standard Contract based on a waste management system that would take SNF and/or HLW from utilities at a steady-state rate of 3,000 MTU annually. See, e.g., Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program at 8

(Sept. 1995) (Exhibit 2). In addition, the utilities believe an annual acceptance rate of 3,000 MTU best reflects DOE's commitment to utilities under the Standard Contract and intend to establish that point during the damages phase of this case. Accordingly, in order for the Government's "alternative contract" argument to be credible, the alternative "acceptance scenarios" set forth in the Standard Contract must be the equivalent to DOE taking SNF at an annual rate of 3,000 MTU. An acceptance rate of 900 MTU annually, or just one spent fuel rod, however, can hardly be considered equivalent to an acceptance rate of 3,000 MTU annually, the rate "bargained-for" by the utilities.

Close scrutiny reveals, therefore, that the Government is not really arguing that the Standard Contract is an alternative contract. Instead of making the case that the Standard Contract allowed DOE to choose *among* alternative acceptance scenarios identified in the Standard Contract, the Government is really arguing in its Response that the Standard Contract allowed DOE to choose the alternative acceptance scenarios in the first instance. Accordingly, the Government merely is reiterating what it has argued in this litigation from the beginning: that DOE has unfettered discretion to decide the nature and extent of its performance under the Standard Contract. Such discretion renders DOE's obligations under the Standard Contract, among other things, illusory. Ridge Runner Forestry v. Veneman, 287 F.3d 1058, 1061 (Fed. Cir. 2002) (defining an illusory promise as one that does not put "any limitation on the freedom of the alleged promisor, but leave[s] his future action subject to his own future will, just as it would have been had he said no words at all") (citations omitted). For this reason alone, the Court should reject the Government's interpretation and arguments in this regard as unreasonable. Retail Clerks Int'l Ass'n v. NLRB, 510 F.2d 802, 806 n.15 (D.C. Cir. 1975) ("It is

a settled rule of contract interpretation that contract language should not be interpreted to render the contract promise illusory or meaningless.") (citations omitted).

**CONCLUSION**

For the foregoing reasons and those stated in its motion for leave, Plaintiff respectfully requests further leave from the Court to supplement its September 2, 2004 reply brief.

Dated: January 24, 2005

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Daniel S. Herzfeld
Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
System Fuels, Inc., on its own behalf
and as agent for Entergy Louisiana, Inc.

OF COUNSEL
Jay E. Silberg
Michael G. Lepre
Walter F. Zenner
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

Document #: 1313682 v.1